No. 112,765

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

DIANA K. HILBURN,
*Appellant*,

v.

ENERPIPE, LTD.,
*Appellee*.

SYLLABUS BY THE COURT

1.

Because the jury's role at common law included the calculation of damages, the limitation on damages contained in K.S.A. 60-19a02 encroaches on the right to a trial by jury guaranteed by Section 5 of the Kansas Constitution. This encroachment alone does not necessarily render K.S.A. 60-19a02 unconstitutional. The legislature may modify the common law in limited circumstances without violating Section 5 of the Kansas Constitution.

2.

The correct test to use to determine whether the legislature has overstepped its constitutional authority by encroaching on the right to a trial by jury guaranteed by Section 5 of the Kansas Constitution or the right to a remedy by due course of law guaranteed by Section 18 of the Kansas Constitution by imposing statutory caps on noneconomic damage recovery is the quid pro quo test outlined in *Miller v. Johnson*, 295 Kan. 636, 289 P.3d 1098 (2012).

1

3.

The quid pro quo test involves two steps. First, the court must decide whether modification to the common-law remedy or right to jury trial is reasonably necessary in the public interest to promote the public welfare. Second, the court must determine whether the legislature substituted an adequate statutory remedy for the modification to the individual right.

4.

Similar to the medical malpractice insurance discussed in *Miller*, Kansas requires that drivers maintain a certain minimum level of automobile liability insurance under the Kansas Automobile Injury Reparations Act (KAIRA), K.S.A. 40-3101 *et seq.* In addition, motor carriers operating in the state are required to maintain minimum levels of liability insurance pursuant to both state and federal law. Both statutory schemes have the purpose of protecting the interests of the public by providing a means of quickly compensating persons for injury resulting from the negligent operation of motor vehicles in the state.

5.

Because the damages cap at K.S.A. 60-19a02 operates in a broader scheme of mandatory insurance and the State maintains an interest in that insurance remaining available and affordable to compensate motor vehicle accident victims, the first step of the *Miller* quid pro quo test is satisfied.

6.

Because the statutory motor vehicle and motor carrier insurance schemes adopted in Kansas provide an adequate remedy for damages arising from personal injury, the second step of the *Miller* quid pro quo test is satisfied.

7.

K.S.A. 60-19a02, establishing caps on recovery for noneconomic damages in personal injury actions, is constitutional as applied to personal injuries resulting from collisions between motor carriers and motor vehicles.

Appeal from Sedgwick District Court; TIMOTHY H. HENDERSON, judge. Opinion filed March 11, 2016. Affirmed.

*Thomas M. Warner*, of Warner Law Offices, P.A., of Wichita, for appellant.

*Kelly A. Ricke* and *Andrew D. Holder*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Overland Park, for appellee.

Before ARNOLD-BURGER, P.J., GREEN and STANDRIDGE, JJ.

ARNOLD-BURGER, J.:  While Diana K. Hilburn rode home with her husband, a truck owned and operated by Enerpipe, Ltd. (Enerpipe) rear-ended their car. The collision negatively impacted Hilburn's recovery from a recent back surgery, resulting in a second surgery and chronic pain. After a trial, a jury returned a verdict in the amount of $335,000 in total damages for Hilburn, most of which compensated for her noneconomic losses. Over Hilburn's objection, the district court reduced her damages pursuant to the Kansas noneconomic loss damages statute, K.S.A. 60-19a02.

On appeal, Hilburn challenges the constitutionality of the statutory cap as applied to a negligence claim that does not involve medical malpractice. But first, she asks this court to conclude that the Supreme Court erred in its finding in *Miller v. Johnson*, 295 Kan. 636, 289 P.3d 1098 (2012), that a quid pro quo test applies to claims under Section 5 of the Kansas Constitution. Because this court is duty bound to follow Supreme Court precedent absent some indication that the court is abandoning its prior position, Hilburn's claim fails. Second, she asks us to limit the *Miller* ruling to medical malpractice claims

3

because the Supreme Court relied on the insurance scheme established in the Health Care Provider Insurance Availability Act, an act that does not apply to other torts. Because the State has established a similar insurance scheme for injuries caused by the negligence of motor carriers and automobile drivers, we find the rationale of the *Miller* court controls our decision in this case. Accordingly, the decision of the district court is affirmed.

FACTUAL AND PROCEDURAL HISTORY

In November 2010, Hilburn underwent a lumbar fusion surgery to address degenerated disks in her back. This surgery required removing abnormal disks and inserting hardware to help fuse bone together. Nine days later, as she and her husband drove home from picking up a prescription in Wichita, Hilburn's husband slowed their car in heavy traffic to accommodate a law enforcement vehicle that had pulled onto the median. The semi-truck behind them, driven by Jimmy Harris, attempted to stop but ended up rear-ending their car. Neither party disputes that Enerpipe owned the truck, employed Harris, and was operating as a motor carrier at the time of the accident.

After the collision, Hilburn suffered a large amount of pain and involuntary muscle contractions in her back. The impact loosened the hardware from her surgery and caused the bone fusion process to fail, which ultimately resulted in a second surgery. Even after this surgery, Hilburn suffered chronic back pain that required daily medication to manage.

Hilburn sued Enerpipe for negligence. Enerpipe admitted to many of her allegations, including that the accident "was caused by the negligent actions of [the] driver in operating [Enerpipe's] vehicle," and the case proceeded to jury trial on the issue of damages. After hearing all the evidence, the jury returned a verdict of $335,000 in total damages for Hilburn; $301,509.14 constituted noneconomic loss damages.

4

Pursuant to our Kansas damages cap statute, K.S.A. 60-19a02, the district court reduced the amount of noneconomic loss damages to $250,000. Hilburn objected to the journal entry that memorialized application of the statute. At a hearing, she acknowledged that a recent Kansas Supreme Court case, *Miller*, 295 Kan. 636, had decided the issue, but she argued that because *Miller* concerned a medical malpractice plaintiff, her case differed dramatically. The district court disagreed, explaining:

> "I do agree with the plaintiff's description that [the Supreme Court] did allow for the [reduction in noneconomic damages] because the legislature required . . . mandatory malpractice insurance. Is this case distinguishable in the sense that this is not a medical malpractice case? Yes. However, the Court finds it may be a distinction without a difference. This is what I mean, is that while semis are regulated for insurance by federal law, if that federal law did not exist and supersede Kansas law of our Constitution the state law of mandatory insurance would also apply. The reason that is important is this Court's finding that the legislature did the same thing with car insurance, effectively, as they did with medical malpractice insurance that Kansas requires . . . .
>
> "For that reason, the Court finds the same analysis that was in the *Miller versus Johnson* case applies here as well and that the legislature also equally has the right to limit noneconomic damages because they require and modify a common law obligation that did not exist regarding mandatory automobile insurance."

The district court therefore denied Hilburn's request and reduced the award. Hilburn timely appealed.

ANALYSIS

The sole issue in this case is whether the noneconomic damages cap contained at K.S.A. 60-19a02 is constitutional in the context of a negligence claim against an out-of-state commercial trucking company for injuries sustained in an automobile collision in

Kansas. We begin with the statute being challenged. In pertinent part, the statute provides:

> "(b) In any personal injury action, the total amount recoverable by each party from all defendants for all claims for noneconomic loss shall not exceed a sum total of $250,000.
>
>   . . . .
>
> "(d) If a personal injury action is tried to a jury, the court shall not instruct the jury on the limitations of this section. If the verdict results in an award for noneconomic loss which exceeds [$250,000], the court shall enter judgment for $250,000 for all the party's claims for noneconomic loss." K.S.A. 60-19a02.

"'Noneconomic losses'" includes "'claims for pain and suffering, mental anguish, injury and disfigurement not affecting earning capacity, and losses which cannot be easily expressed in dollars and cents.'" *Miller*, 295 Kan. at 644. In this case, the jury returned a verdict as to noneconomic damages of $301,509.14, and the district court reduced it to $250,000 per the statute and our Supreme Court's ruling in *Miller*. Because a review of the *Miller* case, which held that K.S.A. 60-19a02 is constitutional in the case of a medical malpractice claim, will help to better understand Hilburn's arguments on appeal and guide the ultimate outcome of this case, we will next review the Supreme Court analysis in *Miller*.

*We review* Miller *and the quid pro quo test it established.*

In order to address some medical issues, Amy Miller consented to the removal of her right ovary. Although the documentation from her surgery indicated that her doctor had removed the correct ovary, she continued to suffer severe pain. An examination by another doctor revealed that Miller's doctor had actually removed her left ovary instead of her right. Nonsurgical options to manage Miller's pain failed, requiring a second surgery and removal of her remaining ovary.

6

Miller sued the original doctor for medical malpractice, and the jury "found the doctor completely at fault." 295 Kan. at 642. The jury awarded Miller over $750,000 in damages, including $575,000 for her noneconomic loss. But in accordance with K.S.A. 60-19a02, the district court reduced the noneconomic loss damages to $250,000. Miller objected to this reduction.

Miller argued that K.S.A. 60-19a02 violated two of her rights under the Kansas Constitution Bill of Rights: her right to trial by jury (Section 5) and her right to remedy by due course of law (Section 18). Starting with Miller's right under Section 5, the Supreme Court first observed that although the constitution preserves the "'inviolate'" right of trial by jury, that preservation is limited to the right "as it historically existed at common law when our state's constitution came into existence." 295 Kan. at 647. But because the jury's role at common law included the calculation of damages, the Supreme Court recognized that the statute indeed encroached on the right guaranteed by Section 5. 295 Kan. at 648.

But this encroachment alone did "not necessarily render K.S.A. 60-19a02 unconstitutional." 295 Kan. at 648. Instead, the court needed to decide whether the legislature, which "may modify the common law in limited circumstances without violating Section 5," had exceeded its authority. 295 Kan. at 648. After a lengthy analysis, the court determined that the correct test to determine whether the legislature overstepped its bounds was the same test used to address Section 18 challenges, commonly called the quid pro quo test. 295 Kan. at 648-53.

As explained by our Supreme Court, the quid pro quo test involves two steps. First, the court must decide "whether modification to the common-law remedy or the right to jury trial is reasonably necessary in the public interest to promote the public welfare." 295 Kan. at 657. This analysis resembles the one "used to decide equal protection questions under the rational basis standard." 295 Kan. at 657. Second, the

7

court must "determine whether the legislature substituted an adequate statutory remedy for the modification to the individual right." 295 Kan. at 657. This "more stringent" step requires there be "an adequate substitute remedy conferred on those individuals whose rights are adversely impacted." 295 Kan. at 657.

While recognizing that it had previously upheld the damages cap in *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 789 P.2d 541 (1990) (commonly referred to as *Samsel II*), our Supreme Court elected against simply applying that rationale to Miller's case. *Miller*, 295 Kan. at 657. Instead, the court found three reasons to reconsider its analysis: (1) Miller, a medical malpractice plaintiff, differed considerably from the car accident plaintiff in *Samsel II*; (2) the damages cap had remained the same in the 20-plus years since the earlier decision, possibly rendering it "inadequate over time or because of changed circumstances"; and (3) the *Samsel II* court erred in part of its analysis by reading too much into a portion of the statute. *Miller*, 295 Kan. at 657-59.

With that in mind, the court moved on to the first quid pro quo consideration: whether the economic damages cap promoted the public welfare. However, the court quickly determined that "our caselaw generally settles the first step . . . in favor of the statute's constitutionality." 295 Kan. at 660. After all, prior cases from our Supreme Court had already established that "the legislature's expressed goals for the comprehensive legislation comprising the Health Care Insurance Provider Availability Act and the noneconomic damages cap have long been accepted by this court to carry a valid public interest objective." 295 Kan. at 659.

Accordingly, the court moved to the second step, "determin[ing] whether the legislature substituted an adequate statutory remedy for the modification of the individual rights at issue." 295 Kan. at 660. The court acknowledged that the deprivation caused by the noneconomic damages cap was significant when compared to those in other quid pro

8

quo cases. That said, the court also observed that Miller had "not been left without any compensation for her loss as other plaintiffs in some of our other cases." 295 Kan. at 660-61. Overall, our Supreme Court described the deprivation as "limited in scope" and determined this limitation to be "a substantial consideration when deciding how adequate the substitute remedy provided by the legislature must be." 295 Kan. at 661.

Next, the court examined the Health Care Provider Insurance Availability Act, which mandates that healthcare providers in Kansas maintain a minimum level of professional liability insurance. 295 Kan. at 661. Specifically, each provider needed to maintain minimum coverage of at least $200,000 per claim, "subject to not less than a $600,000 annual aggregate for all claims made during the policy period." K.S.A. 40-3402(a). Providers also needed to obtain excess coverage from the Health Care Stabilization Fund at a minimum of $100,000 with an aggregate limit of $300,000 per year in excess coverage for any one judgment or settlement. K.S.A. 2010 Supp. 40-3403(l); 295 Kan. at 661-62. The court determined that these provisions made "recovery of at least the statutory minimums directly available as a benefit to medical malpractice plaintiffs when there is a finding of liability." 295 Kan. at 662. This protection, the court reasoned, separated Miller from "many other tort victims." 295 Kan. at 662. Our Supreme Court further observed that, in other cases, it had determined that the remedy provided by the Act constituted an adequate substitute for their common-law counterparts. 295 Kan. at 662. Moreover, the court noted that "in the context of our workers compensation and no-fault automobile insurance caselaw, we have found the requirement of reliable sources of partial recovery for serious injuries to be significant in the quid pro quo analysis." 295 Kan. at 662.

In conclusion, Miller's access to "an available source of recovery of the statutorily mandated minimums" constituted "a significant, individualized substitute remedy" to the common-law rights the damages cap encroached on. 295 Kan. at 662. And after rejecting Miller's claim that the legislature's failure to raise the cap from $250,000 "diluted the

substitute remedy" enough to render the statute unconstitutional, our Supreme Court determined that K.S.A. 60-19a02 did not violate Sections 5 and 18 of the Kansas Constitution. 295 Kan. at 662-65.

*When faced with a challenge to the constitutionality of a statute, our review is unlimited.*

In light of our Kansas Supreme Court's ruling in *Miller*, Hilburn presents two challenges to K.S.A. 60-19a02. First, she contends that our Kansas Supreme Court erred in applying the quid pro quo test to Section 5 challenges. Second, she argues that because she differs dramatically from a medical malpractice plaintiff, the rationale in *Miller* is inapplicable to her case. As a note, it is somewhat unclear from her brief whether her as-applied challenge is based on Section 5 or Section 18 of the Kansas Constitution. However, because the quid pro quo test applies to both sections, the distinction is ultimately immaterial.

As our Supreme Court observed in *Miller*, the question of whether a statute violates our Kansas Constitution is a question of law subject to unlimited review. 295 Kan. 636, Syl. ¶ 1. That said, courts are charged with presuming a statute's constitutionality and resolving all doubts in favor of that statute's validity. 295 Kan. 636, Syl. ¶ 1. Accordingly, "[a] statute must clearly violate the constitution before it may be struck down." 295 Kan. 636, Syl. ¶ 1.

*This court must use the quid pro quo test when considering the constitutionality of K.S.A. 60-19a02.*

In her first argument, Hilburn "urges the court to abandon its finding in *Miller* that the quid pro quo test is applicable to Section 5 claims." But even overlooking Hilburn's confusion as to which court originated this test, this court cannot simply ignore Supreme Court precedent. In fact, this court is duty bound to follow Supreme Court precedent

10

absent some indication that the court is abandoning its prior position. *Farley v. Above Par Transportation*, 50 Kan. App. 2d 866, 877, 334 P.3d 883 (2014), *rev. denied* 302 Kan. ___ (2015). No such indication exists in this case. Accordingly, this court must use the quid pro quo test when considering the constitutionality of K.S.A. 60-19a02 as applied to Hilburn. So next we will discuss the application of the quid pro quo test to the facts of this case.

*Applying the first step of the quid pro quo test to the instant case, the statute serves to promote the public interest and welfare.*

As previously explained, the first step of the quid pro quo test asks "whether the modification to the common-law remedy or the right to jury trial is reasonably necessary in the public interest to promote the public welfare." *Miller*, 295 Kan. at 657. In addressing this step, Hilburn argues that the damages cap cannot possibly be in the public interest because it provides out-of-state companies like Enerpipe a windfall by limiting their liability in Kansas. As a preliminary note, and aside from two brief references to caselaw outside of this jurisdiction, Hilburn fails to cite any pertinent, relevant authority to support this point. As is frequently reiterated, failure to support a point with authority is akin to failing to brief the issue. *State v. Tague*, 296 Kan. 993, 1001, 298 P.3d 273 (2013).

Moreover, even if an unintended consequence of the damages cap is that it limits liability in some cases, the stated purpose of the cap is entirely different. As explained in *Samsel II*, an automobile collision case:

> "The legislature's enactment of [the cap] was influenced by the *Citizens Committee Report*. The Citizens Committee found that the unpredictability of awards for pain and suffering 'makes it very difficult to write insurance or to self-insure at appropriate premium or cost levels, and also sometimes results in pain and suffering

11

awards that are so high they result in unreasonable premium increases. In many instances, these increases reach the level of unaffordability.'" 246 Kan. at 353.

When placing the damages cap in its proper context in *Miller*, our Kansas Supreme Court found a similar purpose: namely, to make medical malpractice insurance available and affordable. See 295 Kan. at 660.

Clearly, the cost and availability of medical malpractice insurance are not particularly relevant in the instant case. But like with malpractice insurance, Kansas requires that drivers maintain a certain level of automobile liability insurance under the Kansas Automobile Injury Reparations Act (KAIRA), K.S.A. 40-3101 *et seq.* K.S.A. 2010 Supp. 40-3104(a). In fact, the stated purpose of the law requiring liability insurance for drivers "is to provide a means of compensating persons promptly for accidental bodily injury arising out of the ownership, operation, maintenance or use of motor vehicles in lieu of liability for damages." K.S.A. 40-3102. Moreover, and as will be discussed in more detail later, our Kansas statutes also require that motor carriers operating in the state maintain liability insurance. K.S.A. 2010 Supp. 66-1,108b (granting the Kansas Corporation Commission "full power, authority and jurisdiction to supervise and control motor carriers"); K.A.R. 82-4-3n (2015 Supp.) (adopting the federal minimum for liability insurance). Like with personal automobile insurance, these mandatory minimums exist to "to protect the interests of the *public* for injuries due to the negligent operation of licensed motor carriers . . . ." *Brown v. Green*, 204 Kan. 802, 807, 466 P.2d 299 (1970), *overruled on other grounds by Spruill Motors, Inc. v. Universal Underwriters Ins. Co.*, 212 Kan. 681, 512 P.2d 403 (1973). Additionally, albeit in other contexts, our Supreme Court has emphasized the importance in protecting those Kansans who travel on public highways by assuring they receive prompt compensation for automobile accidents. *Manzanares v. Bell*, 214 Kan. 589, 601, 522 P.2d 1291 (1974) (holding the KAIRA, also referred to as the no-fault automobile insurance law, constitutional).

12

Aside from her contentions regarding Enerpipe's status as a motor carrier, which will be discussed next, Hilburn offers no real explanation for why the public interest rationale in *Miller* is inapplicable here. Because the damages cap operates in a broader scheme of mandatory insurance and the State maintains an interest in that insurance remaining available and affordable to compensate accident victims, the first step of the quid pro quo test is satisfied.

*Applying the second step of the quid pro quo test to the instant case, an adequate statutory remedy is provided within the scheme of motor carrier insurance.*

In the second step of the quid pro quo analysis, this court must "determine whether the legislature substituted an adequate statutory remedy for the modification to the individual right." *Miller*, 295 Kan. at 657. This "more stringent" step requires there be "an adequate substitute remedy conferred on those individuals whose rights are adversely impacted." 295 Kan. at 657.

In her brief, Hilburn acknowledges that, like with healthcare providers and medical malpractice insurance, motor carriers are required to carry a certain level of liability insurance. However, Hilburn appears to contend that because it is federal rather than state law that mandates this particular liability insurance, our legislature has not substituted an adequate remedy. To put it another way, Hilburn argues that because the wrong legislature provided the substitute remedy, this step remains unsatisfied.

To a certain extent, Hilburn is correct. Federal law mandates that a motor carrier operating in interstate commerce must maintain a certain level of liability insurance. See 49 U.S.C. § 13906(a)(1) (2012) (requiring that, in order to register as a motor carrier, the registrant must file "a bond, insurance policy, or other type of security . . . in an amount not less" than the required minimum); 49 U.S.C. § 31139(b) (2012) (setting out the general minimum liability amount). Specifically, a for-hire motor carrier operating a

13

vehicle with a weight of more than 10,001 pounds that carries nonhazardous material must maintain at least $750,000 of insurance on that vehicle. See 49 U.S.C. § 31139(b) (2012); 49 C.F.R. § 387.9 (2015). The minimum level of insurance is even higher for those motor carriers transporting hazardous material. 49 C.F.R. § 387.9 (2015).

However, our Kansas Legislature has also enacted laws concerning the regulation of motor carriers in our state. See K.S.A. 2010 Supp. 66-1,108b (granting the Kansas Corporation Commission "full power, authority and jurisdiction to supervise and control motor carriers"). Among the regulations promulgated by the corporation commission is K.A.R. 82-4-3n (2015 Supp.), which specifically adopts the minimum liability requirements from the federal regulations. In fact, our Kansas regulation explicitly incorporates 49 C.F.R. § 387, subject to some alterations. K.A.R. 82-4-3n (2015 Supp.). These changes and deletions do not alter the $750,000 liability minimum present in the applicable federal regulation. See K.A.R. 82-4-3n (2015 Supp.). Moreover, our Kansas statutes also provide an independent liability insurance requirement for motor carriers outside of the federal scheme. See K.S.A. 2010 Supp. 66-1,128(a) (stating that except as provided in federal statutes, motor carriers must obtain liability insurance in the amount of $100,000 for one injury or death in one accident, $300,000 for two or more injuries or death in one accident, and $50,000 for the loss of property in one accident). The purpose of this statute, at least according to one appellate court, is to "requir[e] all persons using the Kansas highways as commercial carriers to carry sufficient insurance on their motor equipment to protect the public in case of injuries sustained from the negligent operation of the same." *Marriott v. National Mut. Cas. Co.*, 195 F.2d 462, 466 (10th Cir. 1952); see *Brown*, 204 Kan. at 807.

In her reply brief, Hilburn suggests that our state's adoption of the federal liability minimum is insufficient to constitute our Kansas Legislature creating an adequate statutory remedy. In support, she points to a federal regulation that limits a state's ability to pass or enforce laws concerning interstate motor carriers. But that regulation clearly

14

only limits a state's ability to pass laws that are incompatible with the federal regulations. 49 C.F.R. § 355.25(a) (2015) (barring states from passing or enforcing laws or regulations "pertaining to commercial motor vehicle safety in interstate commerce which the Administrator finds to be incompatible with the provisions of the Federal Motor Carrier Safety Regulations"). Given that our Kansas regulation adopted its federal counterpart with only minor changes, it is disingenuous to suggest the laws are incompatible. This conclusion is bolstered by the fact that the federal regulations actually define compatible state laws as those that are either identical to their federal counterparts, have the same effect as their federal counterparts, or "fall within the established limited variances" allowed by the regulations. 49 C.F.R. § 355.5 (2015).

Although the required insurance amounts are different, this motor carrier liability scheme behaves similarly to the medical malpractice insurance one that our Supreme Court found so important in *Miller*. There, the court emphasized that it had previously "found the requirement of reliable sources of partial recovery for serious injuries to be significant in . . . deciding what constituted an adequate substitute remedy." 295 Kan. at 662. Here, a reliable source of recovery exists in the form of motor carrier liability insurance mandated by both our state legislature and the federal government, and Hilburn, as someone involved in an automobile accident with a motor carrier, is entitled to its benefits.

Additionally, this motor carrier liability insurance is not the only substitute remedy available to Hilburn. As previously mentioned, under the KAIRA, all Kansas drivers are required to carry liability insurance on their personal vehicles. K.S.A. 2010 Supp. 40-3104(a). In fact, uninsured vehicles are not permitted on our Kansas highways unless they are "expressly exempted" from the general insurance requirement. K.S.A. 2010 Supp. 40-3104(b). Each policy must carry coverage for at least $25,000 for injury or death of one person in one accident, $50,000 for injury or death of two or more people in one accident, and $10,000 for harm to property in one accident. K.S.A. 40-3107(e). It

15

stands to reason that, as a driver of a vehicle on a Kansas highway, Hilburn and her husband had this mandatory insurance—insurance that protected both of them in the event of an accident. Our Supreme Court has previously upheld this insurance as an adequate substitute remedy under the quid pro quo test. *Manzanares*, 214 Kan. at 599. And when discussing *Manzanares* in another context, the court noted that the insurance requirement constituted an adequate remedy "even though the injured party was required to purchase the insurance himself or herself." *Aves v. Shah*, 258 Kan. 506, 522-23, 906 P.2d 642 (1995).

In her reply brief, Hilburn contends for the first time that the requirement of mandatory automobile insurance cannot constitute an adequate substitute remedy because it predated K.S.A. 60-19a02. In other words, Hilburn argues that to satisfy the quid pro quo test, the substitute remedy must follow the modification of the individual right.

But our Kansas Supreme Court rejected a similar argument in *Bair v. Peck*, 248 Kan. 824, 844-45, 811 P.2d 1176 (1991), and disapproved of other, earlier language to the contrary. There, the Supreme Court considered a certified question concerning a challenge to the Health Care Provider Insurance Availability Act. Specifically, the medical malpractice plaintiff argued that because the substitute remedies provided by the statute predated the adoption of a provision that eliminated vicarious liability for employer healthcare providers, those remedies could not satisfy the quid pro quo test. But our Supreme Court aptly observed "that major statutory enactments establishing a broad, comprehensive statutory remedy or scheme of reparation in derogation of a previously existing common-law remedy may be subsequently amended or altered without each such subsequent change being supported by an independent and separate quid pro quo." 248 Kan. at 842. Closely examining the "sizeable quid pro quo" provided by the act at issue, the court concluded that the remedy's sufficiency was not reduced because it predated the new provision. 248 Kan. at 843-44. According to the court, the proper test was simply

"whether the substitute remedy would have been sufficient if the modification had been a part of the original [a]ct." 248 Kan. at 844.

Of course, this case differs slightly from *Bair*, as no court has previously determined that the mandatory vehicle insurance discussed above constitutes adequate quid pro quo for purposes of the damages cap. But Hilburn offers no argument that the minimum insurance requirements for either motor carriers or other drivers are insufficient or that this insurance scheme differs significantly from the medical malpractice insurance discussed in *Miller*. Instead, her only arguments revolve around which legislature provided the remedy at issue and the passage date of the statutes. And importantly, *Miller* relied in part on cases discussing the mandatory automobile insurance scheme to decide that the comprehensive medical malpractice insurance scheme constituted an adequate substitute remedy. See 295 Kan. at 662.

Obviously, the recovery schemes discussed above are not available to all tort victims. But for Hilburn, the victim of an automobile accident caused by a motor carrier, they provide "a significant, individualized substitute remedy." *Miller*, 295 Kan. at 662. Therefore, the second step of the quid pro quo test is satisfied, and the damages cap found in K.S.A. 60-19a02 does not violate the Kansas Constitution as applied to Hilburn.

As a final note, Hilburn concludes her appellate brief by arguing that our Supreme Court's individualized quid pro quo test essentially creates a scenario in which different types of tort victims are treated differently depending on the statutes applicable to their cases. In support of her argument, she cites the equal protection provision of Section 1 of the Kansas Constitution Bill of Rights. But as Hilburn recognizes, equal protection challenges focus on statutes, not on judicially created factor tests. See *Miller*, 295 Kan. at 666 (discussing the steps of an equal protection challenge to a "statutory classification"). Moreover, our Kansas Supreme Court considered an equal protection challenge to K.S.A. 60-19a02 in *Miller* but upheld the statute as constitutional. 295 Kan. at 666-70. As

17

previously stated, this court is duty bound to follow Kansas Supreme Court precedent, regardless of whether we agree with the analysis. *Farley*, 50 Kan. App. 2d at 877. Accordingly, the district court decision is affirmed.

Affirmed.