The decision of the court was delivered by Beier, J.:
*511 This case requires us once again to examine the constitutionality of K.S.A. 60-19a02, which caps jury awards for noneconomic damages in personal injury actions. Plaintiff Diana K. Hilburn argues that the application of K.S.A. 60-19a02 to reduce her jury award of $ 335,000 to a judgment of $ 283,490.86 violated her rights under section 5 and section 18 of the Kansas Constitution Bill of Rights.
In Miller v. Johnson , 295 Kan. 636, 289 P.3d 1098 (2012), a majority of this court upheld the application of the noneconomic damages cap to a medical malpractice plaintiff's jury award in the face of challenges under section 5 and section 18. The Miller majority extended what it described as a "well-entrenched" section 18 quid pro quo analysis to section 5 challenges. Under that test, the Legislature must provide an "adequate and viable substitute when modifying a common-law jury trial right under Section 5 or right to remedy under Section 18." 295 Kan. at 654, 289 P.3d 1098.
Today, in this auto-truck accident case, we change course on section 5, declining to apply the quid pro quo test to analyze Hilburn's challenge. Section 5 declares, "The right of trial by jury shall be inviolate." As discussed below in detail, the noneconomic damages cap under K.S.A. 60-19a02 violates Hilburn's right protected by section 5 because it intrudes upon the jury's determination of the compensation owed her to redress her injury. We therefore reverse the Court of Appeals decision affirming the district court, reverse the district court's judgment, and remand this case to district court for entry of judgment in Hilburn's favor on the jury's full award. This decision eliminates any necessity of addressing Hilburn's section 18 claim.
FACTUAL AND PROCEDURAL BACKGROUND
Hilburn was injured in November 2010 when the car in which she was riding was rear-ended by a semi-truck. Hilburn sued the truck's owner, Enerpipe Ltd., alleging that the truck driver's negligence caused the collision and that Enerpipe was vicariously liable for its driver's actions.
In its answer to Hilburn's Petition, Enerpipe admitted the driver's negligence and conceded its vicarious liability.
The case proceeded to a trial on damages, after which a jury awarded Hilburn $ 335,000 in damages comprising $ 33,490.86 for medical expenses and $ 301,509.14 for noneconomic losses.
Defense counsel prepared a journal entry of judgment against Enerpipe for $ 283,490.86 because, "pursuant to K.S.A. 60-19a02(d), judgment must be entered in the amount of $ 250,000 for all of Diana K. Hilburn's noneconomic loss." Hilburn objected on the ground that K.S.A. 60-19a02 is unconstitutional. She alleged violations of sections 1, 5, and 18 of the Kansas Constitution Bill of Rights, as well as the jury trial and due process guarantees of the United States Constitution.
The district court judge acknowledged that Hilburn's case was distinguishable from Miller , which was a medical malpractice case, but he ultimately decided the constitutional issues in defendant's favor. The judge accepted Enerpipe's argument that there was an adequate substitute remedy for Hilburn's loss of any section 5 or section 18 rights, just as mandatory medical malpractice insurance had constituted an adequate substitute remedy in Miller . He relied on federal law mandating that a motor carrier operating in interstate commerce must maintain a minimum level of liability insurance, see 49 U.S.C. § 13906(a)(1) (2012) ; on Kansas law and regulation adopting the federal minimum liability requirements, see K.S.A. 2010 Supp. 66-1,108b ; K.A.R. 82-4-3n (2014 Supp.) ; and on Kansas' no-fault auto insurance regime under the Kansas Automobile Injury Reparations Act, K.S.A. 40-3101 et seq. (KAIRA); see also K.S.A. 40-3107(e) - (f) (requiring all policies *512 contain minimum levels of personal injury protection benefits). The district judge entered a $ 283,490.86 judgment for Hilburn.
Hilburn appealed to the Court of Appeals. In her brief, Hilburn asserted a facial challenge to the damages cap under section 5, asserting that the quid pro quo test should not be applied to analyze that claim. In addition, she argued that the cap violated section 18 because the Legislature had not provided a suitable or sufficient substitute remedy. According to Hilburn, the two necessary prongs of the quid pro quo test were unmet: The noneconomic damages limitation was not reasonably necessary in the public interest, "as applied" to her; and the Legislature failed to provide an adequate substitute remedy for impairment of her constitutional rights.
The Court of Appeals panel rejected Hilburn's arguments and affirmed. See Hilburn v. Enerpipe, Ltd. , 52 Kan. App. 2d 546, 560, 370 P.3d 428 (2016). Believing itself bound by the precedent of Miller , the panel summarily declined Hilburn's invitation to reexamine the threshold legal issue of whether the quid pro quo test should apply to section 5. 52 Kan. App. 2d at 554, 370 P.3d 428.
The panel then turned to the first prong of the quid pro quo test for both section 5 and section 18 and determined that it had been satisfied. Modification of the right to jury trial under section 5 and the common-law right to remedy under section 18 was " 'reasonably necessary in the public interest to promote the public welfare,' " because "the damages cap operates in a broader scheme of mandatory insurance and the State maintains an interest in that insurance remaining available and affordable to compensate accident victims." 52 Kan. App. 2d at 554, 556, 370 P.3d 428 (quoting Miller , 295 Kan. at 657, 289 P.3d 1098 ).
The panel also concluded that the " 'more stringent' " second prong of the quid pro quo test, that is, adequacy, had been satisfied because mandatory insurance for motor carriers guaranteed "a reliable source of recovery" for victims in accidents involving trucks. Hilburn , 52 Kan. App. 2d at 556, 558, 370 P.3d 428. The panel relied on federal and state mandatory motor vehicle insurance laws and KAIRA.
Hilburn petitioned this court for review, which was granted.
The Kansas Attorney General intervened after initial oral argument in this case, pursuant to K.S.A. 2018 Supp. 75-764. The Attorney General, like Enerpipe, argued that the quid pro quo test had been satisfied for both section 5 and section 18. But, like Hilburn, he questioned the applicability of the test to section 5, arguing that "legislative restrictions on remedies do not violate the right to trial by jury." The Attorney General also asked this court to reconsider whether a statute alleged to violate section 18 must satisfy the quid pro quo test.
DISCUSSION
Preservation
As a preliminary matter, we take up whether Hilburn preserved her challenge to the applicability of the quid pro quo test for section 5 analysis.
The version of Kansas Supreme Court Rule 8.03(a)(4)(C) in effect at the time Hilburn filed her petition for review required that such a petition contain a "statement of the issues decided by the Court of Appeals of which review is sought" and said that this court would "not consider issues not presented or fairly included in the petition." Supreme Court Rule 8.03(a)(4)(C) (2015 Kan. Ct. R. Annot. 79). Hilburn's petition focused exclusively on whether the Court of Appeals correctly held that the quid pro quo test was satisfied; it did not separately list as an issue or subissue whether the quid pro quo test applied in analyzing a section 5 claim. However, the same rule subsection that purported to limit the number and identity of issues that could be decided on petition for review also explicitly allowed us to "address a plain error not presented." Supreme Court Rule 8.03(a)(4)(C) (2015 Kan. Ct. R. Annot. 79). And, in civil cases such as this, a different subsection of Supreme Court Rule 8.03 permitted but did not require us to consider "other issues that were presented to the Court of Appeals and that the parties have *513 preserved for review." Supreme Court Rule 8.03(h)(1) (2015 Kan. Ct. R. Annot. 81).
Hilburn argued in the district court that her section 5 jury trial right was violated by the noneconomic damages cap, preserving the necessary subissue on the proper legal test to determine the existence of a violation. Her brief to the Court of Appeals challenged whether the quid pro quo test should apply in analysis of her section 5 claim. Indeed, the Court of Appeals panel decided the issue in Enerpipe's favor. See Hilburn , 52 Kan. App. 2d at 554, 370 P.3d 428. Once Hilburn's petition for review was granted, she argued in her supplemental brief to this court that the " 'inviolate' constitutional right to trial by jury should not be impaired by the judicial creation of a quid pro quo substitute remedy" and "urge[d] this court on review to strictly construe Section 5 to its simple, unambiguous meaning and not engage in the judicial creation of exceptions to this 'inviolate' right." In Enerpipe's supplemental brief, filed the same day, it argued we should continue to apply the quid pro quo test in a section 5 analysis. It advanced this argument again in its response to Hilburn's supplemental brief. As mentioned, the Attorney General, as intervenor, also has dealt with the applicability of quid pro quo analysis in cases alleging section 5 violations.
Supreme Court Rule 8.03 has since been amended, effective July 1, 2018, in part to address the inherent tension in the language that was in effect when Hilburn filed her petition for review. See Supreme Court Rule 8.03 (2019 Kan. S. Ct. R. 53). We are satisfied, however, that the issue of whether the quid pro quo test applies to analysis of Hilburn's section 5 claim is properly before us under the old rule. It was preserved in the district court, argued and decided in the Court of Appeals, and addressed by both parties and the intervenor before us.
Standard of Review
The core substantive issue before us is whether K.S.A. 60-19a02 is constitutional. "Whether a statute is constitutional is a question of law." Board of Johnson CountyComm'rs v. Jordan , 303 Kan. 844, 858, 370 P.3d 1170 (2016). We have often said that "before a statute may be struck down, the constitutional violation must be clear. The statute is presumed to be constitutional, and all doubts are resolved in favor of upholding it. If a court can find any reasonable way to construe the statute as valid, it must." Board of Johnson County Comm'rs, 303 Kan. at 858, 370 P.3d 1170 ; see also State v. Laturner , 289 Kan. 727, 735, 218 P.3d 23 (2009) ("Whenever a court considers the constitutionality of a statute, the separation of powers doctrine requires the court to presume the statute is constitutional.").
Recently, however, we pared back this presumption of constitutionality in cases dealing with "fundamental interests" protected by the Kansas Constitution. See Hodes & Nauser, MDs v. Schmidt , 309 Kan. 611, 673-74, 440 P.3d 461 (2019). In such cases, the presumption of constitutionality does not apply.
Section 5 of the Kansas Constitution Bill of Rights states that "[t]he right of trial by jury shall be inviolate." We have previously acknowledged that "[t]his right is 'a basic and fundamental feature of American jurisprudence.' " Miller , 295 Kan. at 647, 289 P.3d 1098 (quoting Gard v. Sherwood Construction Co. , 194 Kan. 541, 549, 400 P.2d 995 [ (1965) ] ). " 'It is a substantial and valuable right and should never be lightly denied. The law favors trial by jury, and the right should be carefully guarded against infringements.' " Miller , 295 Kan. at 647, 289 P.3d 1098 (quoting Gard , 194 Kan. at 549, 400 P.2d 995 ); see also Miller , 295 Kan. at 696, 289 P.3d 1098 (Beier, J., concurring in part and dissenting in part) (right is more than right to impanel a jury, it is a process that includes: right to assemble a jury, right to present evidence, right to have the jury determine and award damages, and right to a judgment for the full damages as determined by jury and supported by evidence).
Hence, we have little difficulty deciding that the right protected by section 5 is a "fundamental interest" expressly protected by the Kansas Constitution Bill of Rights. As such, we will not apply a presumption of constitutionality to challenges brought under section 5.
*514 The Challenged Statute
K.S.A. 60-19a02(a) defines " 'personal injury action' " as "any action seeking damages for personal injury or death." Further,
"(b) In any personal injury action, the total amount recoverable by each party from all defendants for all claims for noneconomic loss shall not exceed a sum total of $ 250,000.
"(c) In every personal injury action, the verdict shall be itemized by the trier of fact to reflect the amount awarded for noneconomic loss.
"(d) If a personal injury action is tried to a jury, the court shall not instruct the jury on the limitations of this section. If the verdict results in an award for noneconomic loss which exceeds the limit of this section, the court shall enter judgment for $ 250,000 for all the party's claims for noneconomic loss. ..." K.S.A. 60-19a02.
The amount of the cap has since been amended upward and is currently $ 325,000. It is set to increase again, to $ 350,000, on July 1, 2022. But these changes are inapplicable to Hilburn and thus not at issue here. See K.S.A. 2018 Supp. 60-19a02(d).
The Test for Section 5 Claims
" Section 5 preserves the jury trial right as it historically existed at common law when our state's constitution came into existence." Miller , 295 Kan. at 647, 289 P.3d 1098 (citing State ex rel. v. City of Topeka , 36 Kan. 76, 85-86, 12 P. 310 [ (1886) ] ); see also Miller , 295 Kan. at 696, 289 P.3d 1098 (Beier, J., concurring in part and dissenting in part) ("This language preserves the right to jury trial in those causes of action that were triable to a jury under the common law extant in 1859, when the Kansas Constitution was ratified by the people of our state."); In re L.M., 286 Kan. 460, 476, 186 P.3d 164 (2008) (Luckert, J., concurring) ("[T]he uncompromising language of [ section 5 ] applies if an examination of history reveals there was a right at common law to a jury trial under the same circumstances.").
We have consistently held that the determination of noneconomic damages was a fundamental part of a jury trial at common law and protected by section 5. See Miller , 295 Kan. at 647, 289 P.3d 1098 (no dispute that determination of damages, including noneconomic damages, was question of fact for jury in common-law tort actions); see also Smith v. Printup , 254 Kan. 315, 324, 866 P.2d 985 (1993) ("There is no question in Kansas that the right to trial by jury includes the right to have a jury determine actual damages."); Samsel v. Wheeler Transport Services, Inc. , 246 Kan. 336, 358, 789 P.2d 541 (1990) ( Samsel II ) (jury trial right includes right to have jury determine damages in personal injury action), disapproved of on other grounds by Bair v. Peck , 248 Kan. 824, 811 P.2d 1176 (1991) ; Kansas Malpractice Victims Coalition v. Bell , 243 Kan. 333, 343, 757 P.2d 251 (1988) (jury's traditional role is to decide issues of fact, determination of damages is issue of fact; thus jury's responsibility to determine damages), disapproved of on other grounds by Bair , 248 Kan. 824, 811 P.2d 1176. Accord Watts v. Lester E. Cox Medical Centers , 376 S.W.3d 633, 640 (Mo. 2012) (Missouri Constitution's "inviolate" right to jury includes right to have jury determine facts, including noneconomic damages).
The noneconomic damages cap in K.S.A. 60-19a02 clearly implicates section 5's "inviolate" jury trial right, as that right has historically been understood. The next question is whether it impairs that right by interfering with the jury's fundamental function. See Markman v. Westview Instruments, Inc., 517 U.S. 370, 376, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996) (after determining applicability, court considers impairment; Seventh Amendment jury trial analysis asks whether "particular trial decision must fall to the jury ... to preserve the substance of the common-law right as it existed" at ratification); 9 Wright & Miller, Federal Practice & Procedure: Civil § 2302.4 (2008) (analysis of whether procedure violates Seventh Amendment "must look to whether that procedure obstructs or interferes with the jury's substantive role as the fact-finder").
We hold the statute necessarily infringes on the constitutional right.
" 'The individual right to trial by jury cannot "remain inviolate" when an injured *515 party is deprived of the jury's constitutionally assigned role of determining damages according to the particular facts of the case.' Watts, [376 S.W.3d at 640.] Giving the jury 'a practically meaningless opportunity to assess damages simply "pays lip service to the form of the jury but robs it of its function." ' [ 376 S.W.3d at 642 ] (quoting Sofie v. Fibreboard Corp., 112 Wash. 2d 636, 655, 771 P.2d 711 [1989] [en banc] ); see also Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt, 286 Ga. 731, 735-36, 691 S.E.2d 218 (2010) (striking down damages cap for infringing state constitution's inviolate right to jury trial); Lakin v. Senco Products, Inc., 329 Or. 62, 78-79, 987 P.2d 463, 473 (1999) (same); Moore v. Mobile Infirmary Ass'n, 592 So. 2d 156, 164 (Ala. 1991) (same); Smith v. Department of Ins., 507 So. 2d 1080, 1089 (Fla. 1987) (same); Arneson v. Olson, 270 N.W.2d 125, 136 (N.D. 1978) (same)." Miller , 295 Kan. at 698 [289 P.3d 1098] (Beier, J., concurring in part and dissenting in part).
Despite this infringement of section 5's jury trial right by K.S.A. 60-19a02, a majority of this court held in Miller that any impairment was permissible as long as the two-part due process-based quid pro quo test applicable in section 18 analysis was satisfied. But the overlay of the quid pro quo test "transforms what the people made inviolate into something violable at will." 295 Kan. at 698-99, 289 P.3d 1098 (Beier, J., concurring in part and dissenting in part). The court's previous decision to apply the quid pro quo test to section 5"overlook[ed] long-standing limitations on the legislature's power to modify the common law; overestimate[d] the persuasive force of prior Kansas cases; and shortcut[ ] the necessary cost-benefit evaluation" necessary when examining whether to keep or jettison originally erroneous precedent. 295 Kan. at 699, 289 P.3d 1098 (Beier, J., concurring in part and dissenting in part).
In Miller , the majority ignored
"the plain 'inviolate' language chosen by Kansas citizens for Section 5's jury trial provision. Inviolate means not 'disturbed or limited.' In re Rolfs, 30 Kan. [758,] 762[, 1 P. 523 (1883) ]. It is defined as ' "[n]ot violated; unimpaired; unbroken; unprofaned." ' Samsel II, 246 Kan. at 368 [789 P.2d 541] (Herd, J., dissenting); see also Watts, [376 S.W.3d at 638 ] ('inviolate' means free from change or blemish, pure, unbroken) (citing Webster's Third New International Dictionary 1190 [1993] ); Sofie [ v. Fibreboard Corp. ], 112 Wash. 2d [636,] 656, [771 P.2d 711 (1989) (en banc) ] (citing same) ('inviolate' connotes deserving of highest protection, free from assault, trespass, untouched, intact). This inviolate right to jury trial is 'a basic and fundamental feature of American jurisprudence.' Gard v. Sherwood Construction Co., 194 Kan. 541, 549, 400 P.2d 995 (1965) ; see also Parklane Hosiery Co. v. Shore, 439 U.S. 322, 340-41, 343, 99 S. Ct. 645, 58 L. Ed. 2d 552 (1979) (Rehnquist, J., dissenting) (right so important that denial of 'right of jury trial was listed among the specific offensive English acts denounced in the Declaration of Independence'; right a 'bulwark' of liberties, so essential that it ' "was probably the only one universally secured by the first American state constitutions" ') (quoting Levy, Legacy of Suppression: Freedom of Speech and Press in Early American History 281 [1960] ).
"The language of Section 5 is 'uncompromising.' In re L.M., 286 Kan. at 476 [186 P.3d 164] (Luckert, J., concurring). Section 5 imposes a 'clear, precise and definite limitation[ ] upon the powers of the legislature.' Atchison Street Rly. Co. v. Mo. Pac. Rly. Co., 31 Kan. 660, 665, 3 P. 284 (1884). It was chosen precisely because the people recognized that the right to jury trial required protection from legislative efforts to modify it in ways that destroy the substance of that right. See Wyandotte Const. Convention 462-63 (July 25, 1859) ('[T]hat very valuable right we propose to secure to the citizen in retaining the right of trial by jury, intact, will be accomplished by the words, "The right of trial by jury shall be inviolate." '); see also State ex rel. v. City of Topeka, 36 Kan. 76, 85-86, 12 P. 310 (1886) (by preserving the right as 'inviolate,' framers intended that the right of trial by jury 'shall be and remain as ample and complete as it was at the time when the [C]onstitution was adopted')."
*516 Miller , 295 Kan. at 699-700, 289 P.3d 1098 (Beier, J., concurring in part and dissenting in part).
As all members of this court acknowledged in Miller , it is within the power of the Legislature to modify the common law. See 295 Kan. at 705, 289 P.3d 1098 (Beier, J., concurring in part and dissenting in part). But "what may have been a mere common-law right to jury trial on the day before ratification of Section 5 was no longer a mere common-law right from ratification onward." 295 Kan. at 705, 289 P.3d 1098 (Beier, J., concurring in part and dissenting in part).
"Ratification expressed the people's choice to elevate the common-law right to jury trial to enumerated constitutional status. That status put it beyond everyday legislative meddling. The people entrusted juries with the task of deciding damages. The legislature's unwillingness to [entrust juries with deciding damages]. . . requires endorsement by the people before it can enjoy the force of law." 295 Kan. at 705-06, 289 P.3d 1098 (Beier, J., concurring in part and dissenting in part).
As the United States Supreme Court emphasized long ago:
"It is said that the common law is susceptible of growth and adaptation to new circumstances and situations, and that the courts have power to declare and effectuate what is the present rule in respect of a given subject without regard to the old rule; and some attempt is made to apply that principle here. The common law is not immutable, but flexible, and upon its own principles adapts itself to varying conditions. [Citation omitted.] But here, we are dealing with a constitutional provision which has in effect adopted the rules of the common law, in respect of trial by jury, as these rules existed in 1791. To effectuate any change in these rules is not to deal with the common law, qua common law, but to alter the Constitution. The distinction is fundamental, and has been clearly pointed out by Judge Cooley in 1 Const. Limitations, 8th Ed., 124." Dimick v. Schiedt , 293 U.S. 474, 487, 55 S. Ct. 296, 79 L. Ed. 603 (1935).
See also Watts, 376 S.W.3d at 643 (allowing Legislature to modify constitutional rights makes protections "of only theoretical value ... [s]uch rights would not be rights at all but merely privileges that could be withdrawn"); Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt, 286 Ga. 731, 736, 691 S.E.2d 218 (2010) (general legislative authority to modify common law does not permit abrogation of constitutional rights); Sofie v. Fibreboard Corp., 112 Wash. 2d 636, 652-53, 771 P.2d 711 (1989).
"Justice Herd made the same point in his dissent in Samsel II :
" 'Giving the legislature the authority to limit damages by changing the common law, or otherwise, violates § 5 of the Kansas Bill of Rights by taking the damage question away from the jury. A written constitution is adopted for the purpose of limiting the power of government. Providing that trial by jury shall be inviolate is a limitation on government as a protection of individual rights. There is no question the legislature has the power to change or abolish the common law. That, however, does not change the Kansas Constitution. A later change in the common law does not affect the meaning of § 5. Its meaning was fixed in 1859. The proper method of constitutional change is by amendment, not legislation.' 246 Kan. at 369-70, 789 P.2d 541 (Herd, J., dissenting).
"Even the case that is generally considered the source of recognition of legislative power to modify common law, Munn v. Illinois, 94 U.S. 113, 134, 24 L. Ed. 77 (1876), is explicit about constitutional limitations on the power: 'Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the legislature, unless prevented by constitutional limitations.' See also In re Tax Appeal of ANR Pipeline Co., 276 Kan. 702, 725, 79 P.3d 751 (2003) (Kansas Constitution limits otherwise plenary power of legislature); Harris v. Shanahan, 192 Kan. 183, 207, 387 P.2d 771 (1963) ('It is axiomatic that [any] act of the legislature[ ] is subject to the limitations contained in the Constitution, and where such act exceeds the bounds of authority *517 vested in the legislature and violates the limitations of the Constitution, it is null and void and it is the duty of courts to so declare.'); Lemons v. Noller, 144 Kan. 813, 817, 63 P.2d 177 (1936) (citing State v. Weiss, 84 Kan. 165, 168, 113 P. 388 [1911] ; Ratcliff v. Stockyards Co., 74 Kan. 1, 16, 86 P. 150 [ (1906) ] ) (legislature free to act except where Kansas Constitution restricts)." Miller , 295 Kan. at 706-07, 289 P.3d 1098 (Beier, J., concurring in part and dissenting in part).
In Miller , a majority of this court relied on stare decisis to ground its application of the quid pro quo test to analysis of a section 5 jury trial challenge. In general, a "court of last resort will follow the rule of law it established in its earlier cases unless clearly convinced the rule was originally erroneous or is no longer sound because of changing conditions and more good than harm will come by departing from precedent." Rhoten v. Dickson , 290 Kan. 92, 112, 223 P.3d 786 (2010).
But this rule "excuses us from following precedent that is 'plainly and unmistakably' the result of mistake and error.' Prowant, Administratrix v. Kings-X, 184 Kan. 413, 416-17, 337 P.2d 1021 (Jackson, J., dissenting), rev'd on rehearing, 185 Kan. 602, 347 P.2d 254 (1959)." Miller , 295 Kan. at 707-08, 289 P.3d 1098 (Beier, J., concurring in part and dissenting in part); see also Arizona v. Gant, 556 U.S. 332, 348, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009) (Stare decisis does not require adherence to "a past decision when its rationale no longer withstands 'careful analysis.' ") (quoting Lawrence v. Texas, 539 U.S. 558, 577, 123 S. Ct. 2472, 156 L. Ed. 2d 508 [2003] ); Bergstrom v. Spears Manufacturing Co., 289 Kan. 605, 610, 214 P.3d 676 (2009) ("This court is not inexorably bound by precedent; it will reject rules that were originally erroneous or are no longer sound.").
Moreover, "stare decisis is at its weakest in constitutional cases because our mistakes cannot be easily corrected by ordinary legislation." Miller , 295 Kan. at 708, 289 P.3d 1098 (Beier, J., concurring in part and dissenting in part) (citing State v. Hoeck, 284 Kan. 441, 463, 163 P.3d 252 [2007] ); see also Agostini v. Felton, 521 U.S. 203, 235, 117 S. Ct. 1997, 138 L. Ed. 2d 391 (1997) (erroneous court interpretations in such cases "can be altered only by constitutional amendment or by overruling our prior decisions"); Watts, 376 S.W.3d at 644 (if people disagree with court interpretation of constitution, opportunity to change organic law more remote than opportunity to repeal, alter statute; " '[m]oreover, no set of judges ought to have the right to tie the hands of their successors on constitutional questions, any more than one [set of legislators] should those of its successors on legislative matters' ") (quoting Mountain Grove Bank v. Douglas County, 146 Mo. 42, 54, 47 S.W. 944 [ (Mo. 1898) ] ). And strict application of stare decisis must be tempered in constitutional cases because
"[o]ur allegiance must be to the Constitution itself, 'not what we have said about it.' Graves v. N.Y. ex rel. O'Keefe, 306 U.S. 466, 491-92, 59 S. Ct. 595, 83 L. Ed. 927 (1939) (Frankfurter, J., concurring); see also Harris v. Anderson, 194 Kan. 302, 314, 400 P.2d 25 (1965) (Fatzer, J., dissenting) (quoting 3 Warren, The Supreme Court in United States History, p. 470: ' "However the court may interpret the provisions of the Constitution, it is still the Constitution which is the law and not the decision of the court. 'To the decision of an underlying question of constitutional law no ... finality attaches. To endure, it must be right.' " ')." Miller , 295 Kan. at 708-09, 289 P.3d 1098 (Beier, J., concurring in part and dissenting in part).
A careful examination of the majority opinion in Miller and the precedent it relied on reveals that application of a quid pro quo test to section 5 claims rests on a shaky foundation.
"The [ Miller majority] relies on Kansas Malpractice Victims Coalition and Samsel II , both of which applied the quid pro quo test to excuse impairment of the right to jury trial. Samsel II, 246 Kan. at 358, 362 [789 P.2d 541] ; Kansas Malpractice Victims Coalition, 243 Kan. at 344-52 [757 P.2d 251]. Samsel II followed Kansas Malpractice Victims Coalition on this point, Samsel II, 246 Kan. at 351-62 [789 P.2d 541] ; and *518 Kansas Malpractice Victims Coalition, in turn, relied on Manzanares [ v. Bell , 214 Kan. 589, 522 P.2d 1291 (1974) ], saying that Manzanares 'found, in substance, that the injured person entitled to benefits under the statute received a sufficient quid pro quo for the limitation placed on his right to a jury trial.' Kansas Malpractice Victims Coalition, 243 Kan. at 344 [757 P.2d 251]. In none of these three cases, however, did this court see fit to explain how or why the quid pro quo test, a due process-based rule originally relating to whether legislation impairs a vested right, can excuse legislation's impairment of a constitutional right to jury trial.
"Moreover, it appears that the initial reliance Kansas Malpractice Victims Coalition placed on Manzanares in order to apply quid pro quo arose out of a misreading. Nowhere in Manzanares ' one-paragraph discussion of the right to jury trial claim before it did this court 'require that the legislature provide an adequate substitute of the right to trial by jury[.]' Note, Testing the Constitutionality of Tort Reform with a Quid Pro Quo Analysis: Is Kansas' Judicial Approach an Adequate Substitute for a More Traditional Constitutional Requirement? , 31 Washburn L.J. 314, 332 (1992)." Miller , 295 Kan. at 709, 289 P.3d 1098 (Beier, J., concurring in part and dissenting in part).
In addition, application of a quid pro quo test to section 5 claims cannot be bolstered by reaching still farther back to Shade v. Cement Co. , 93 Kan. 257, 144 P. 249 (1914).
" Shade involved multiple constitutional challenges to the original workers compensation law. The claims were based on federal due process and equal protection, and on the Kansas Constitution Bill of Rights' Section 5 right to jury trial and Section 18 right to remedy. Shade, 93 Kan. at 258-59 [144 P. 249]. Shade 's notable pithy rationale for rejecting these claims lumps the state constitutional theories together; and the only thing it makes clear is the determinative weight given to the elective nature of the original workers compensation system.
" 'The objection based upon the supposed deprivation of a right of trial by jury is equally untenable, as determined in many adjudicated cases. The same is true of the arbitration feature and the rules for determining compensation. Without reviewing seriatim all the specific objections made to this statute under the general charge that it violates constitutional safeguards, it is sufficient to say that they have all been met in judicial decisions in other jurisdictions after the most thorough and patient examination. ... Briefly, it may be said that the operation of the system of compensation provided by the statute rests upon the free consent of employer and employee, given in the manner provided by the act. Without such consent on his part the employee retains all his remedies under common and statutory law. It is a matter of election.' 93 Kan. at 260, 144 P. 249 (citing Matheson v. Minneapolis St. Ry. Co., 126 Minn. 286, 148 N.W. 71 [ (Minn. 1914) ] [election to be subject to system constitutes waiver of jury trial]; Deibeikis v. Link-Belt Co., 261 Ill. 454, 104 N.E. 211 [ (1914) ] [same] )." Miller , 295 Kan. at 710, 289 P.3d 1098 (Beier, J., concurring in part and dissenting in part).
It is inaccurate to say that Shade applied the quid pro quo test to reject the section 5 challenge, as we have previously recognized in multiple cases. See Baker v. St. Louis Smelting & Refining Co., 145 Kan. 273, 280, 65 P.2d 284 (1937) (260 emphasizing workers compensation system " 'rests upon the free consent of employer and employee' "; thus "the liability of an employer to his employee under the act is a liability arising on contract") (quoting Shade , 93 Kan. at 260, 144 P. 249 ); Potocan v. Hamilton Coal & Mercantile Co., 120 Kan. 326, 329, 243 P. 537 (1926) (citing Shade, 93 Kan. 257, 144 P. 249, for proposition Workers Compensation Act subject to no constitutional infirmity because not compulsory); Smith v. Packing Co., 115 Kan. 874, 875, 225 P. 110 (1924) ("[Q]uestions as to whether various features of a workman's compensation act were violative of the fourteenth amendment have frequently been disposed of by reference to the fact that its application was made optional.") (citing Shade , 93 Kan. at 260, 144 P. 249 ).
*519 Other courts and commentators discussing Shade have reached similar conclusions about its underlying rationale. See Boyd v. Barton Transfer & Storage, 2 Kan. App. 2d 425, 429, 580 P.2d 1366 (1978) (first case to consider Shade since workers compensation system made mandatory, court cites Shade among cases upholding earlier system "against constitutional challenges on the ground that it was optional with the employer and employee"); see also Middleton v. Texas Power & Light Co., 249 U.S. 152, 160, 39 S. Ct. 227, 63 L. Ed. 527 (1919) (citing Shade for upholding act because voluntary); Mosely v. Empire Gas & Fuel Co., 313 Mo. 225, 233-34, 281 S.W. 762 (1926) (same); Harbis v. Cudahy Packing Co., 211 Mo. App. 188, 191, 241 S.W. 960 (1921) (observing "Kansas courts have held that the relation between employer and employee" under workers compensation law "is contractual") (citing Shade , 93 Kan. at 260, 144 P. 249 ); Phillips, The Constitutional Right to a Remedy, 78 N.Y.U. L. Rev. 1309, 1330 n.92 (2003) ("Decisions to uphold the statutes frequently were based on the fact that the employee or employer, or both, had the ability to opt out of the scheme.") (citing Shade , 93 Kan. 257, 144 P. 249 ); Comment, Workers' Compensation Benefits Go From Bad to Worse: The Kansas Supreme Court Eliminates the Parallel Injury Rule, 48 Washburn L.J. 705, 710 n.42 (2009) (describing Shade as upholding original workers compensation law on ground that employers, employees consented to coverage). Rajala v. Doresky, 233 Kan. 440, 661 P.2d 1251 (1983), is even weaker support for the Miller majority's application of a quid pro quo test for section 5 analysis. That case did not "explicitly" apply the test in considering a jury trial challenge.
"The only issue in Rajala was whether the workers compensation law's abrogation of fellow-employee liability violated the Section 18 right to remedy provision. Rajala, 233 Kan. at 441-42, 661 P.2d 1251. Likewise, the ... citation of Injured Workers of Kansas v. Franklin, 262 Kan. 840, 942 P.2d 591 (1997), and Scott v. Hughes, 294 Kan. 403, 275 P.3d 890 (2012), for their discussion of the exchanges of rights and remedies between employers and employees inherent in the Kansas workers compensation scheme cannot help [the Miller majority]. These cases did not have anything to do with a jury trial challenge to the scheme. Thus neither ... stands for[ ] the proposition that the quid pro quo test can be applied to rescue a statute from its violation of Section 5." Miller , 295 Kan. at 711-12, 289 P.3d 1098 (Beier, J., concurring in part and dissenting in part).
In short, none of the Kansas cases relied upon by the Miller majority as controlling precedent for using the quid pro quo test on section 5 challenges withstands scrutiny.
" Manzanares , Kansas Malpractice Victims Coalition , and Samsel II give no explanation ... of why the due process-based concept should be imported from Section 18. Furthermore, ... efforts to press Shade and Rajala into service as substitutes for Manzanares, Kansas Malpractice Victims Coalition , and Samsel II are singularly unconvincing. Shade relied on an entirely different rationale to reject the jury trial and the other state constitutional challenge to the original workers compensation system before the court. Rajala did not involve any jury trial challenge at all. Under these circumstances ... application of the quid pro quo test to Section 5 was originally erroneous and remains so." Miller , 295 Kan. at 712, 289 P.3d 1098 (Beier, J., concurring in part and dissenting in part).
The Miller majority also asserted that the cost-benefit analysis involved in evaluating the wisdom of following precedent favored application of a quid pro quo test to analysis of section 5 claims. In its view, "overruling our past application of the quid pro quo test to excuse violation of the right to jury trial would require dismantling of the workers compensation and no-fault automobile insurance systems. See Rajala, 233 Kan. at 440, 661 P.2d 1251 (workers compensation); Manzanares, 214 Kan. at 589, 522 P.2d 1291 (no-fault)." Miller , 295 Kan. at 712-13, 289 P.3d 1098 (Beier, J., concurring in part and dissenting in part). But the dismantling of those two systems was far from assured for several reasons.
"First, as discussed above, Rajala was a Section 18 decision that did not address *520 the right to jury trial in any way. See Rajala, 233 Kan. at 441, 661 P.2d 1251. Nothing about refusal to apply the quid pro quo test to save a statute impairing the right to jury trial has any bearing on Rajala 's Section 18 holding.
"Second, the comprehensive workers compensation system at issue in Rajala is totally distinct from the noneconomic damages cap applied to reduce [a plaintiff's damages under K.S.A. 60-19a02 ]. [C]ommon-law [personal-injury] cause[s] of action [as they] existed in 1859 [were] not wholly replaced with a comprehensive statutory scheme of compensation not employing jury trials at all. Far from it. ... [P]ersonal injury plaintiffs in Kansas are still required to file civil lawsuits; conduct necessary discovery; obtain required expert testimony; and prove negligence, causation, and damages to a jury by a preponderance of the evidence. The only thing changed by K.S.A. 60-19a02 is whether the district court judge can give effect to the jury's discharge of its constitutional assignment. In the workers compensation arena, although recoveries are fixed, they are directly proportional to the nature and extent of each claimant's injury and income. In addition, distinct Section 18 jurisprudence permitted wholesale abolition and replacement of a common-law cause of action because both sides received clear and comparable benefits from the legislative transaction. The new administrative system of no-fault compensation for injured workers left no common-law cause of action upon which Section 5's jury trial right could act. See Watts, [376 S.W.3d at 638 ] (constitutional right to jury trial contingent upon existence of civil action for damages). The cap [under K.S.A. 60-19a02 ] did nothing of the sort, and its rejection on Section 5 grounds would not cause the collapse of the workers compensation system, much less make it inevitable or imminent.
"Much of the same can be said of the no-fault automobile insurance system. It is markedly distinct from the damages cap at issue here. In order to receive prompt personal injury protection payments after a car accident, an injured person no longer needs to file a lawsuit to prove another's fault and the causal relationship between that fault and damages. Rather, the personal injury protection claimant simply submits a claim to the insurance company. The third-party common-law cause of action for those suffering relatively minor injury was replaced with a first-party insurance contract claim. As with workers compensation, the no-fault automobile insurance system means that every claimant's opportunity to recover is directly proportional to the seriousness of his or her case." Miller , 295 Kan. at 713-14, 289 P.3d 1098 (Beier, J., concurring in part and dissenting in part).
In addition to overstating the potential cost of abandoning the quid pro quo test in section 5 cases, the Miller majority also overestimated the benefits of saving K.S.A. 60-19a02. It asserted that applying the quid pro quo test "foster[ed] certainty." 295 Kan. at 714, 289 P.3d 1098 (Beier, J., concurring in part and dissenting in part). But continuing to apply quid pro quo to section 5 does exactly the opposite.
"Uncertainty is created when error is compounded by blind adherence to precedent that is analytically unsound. Certainty, predictability, stability, and respect for the rule of law are enhanced when this court does what it has otherwise insisted upon doing in every other case calling a legislative act into constitutional question. This is what every Kansan expects of us, and properly so. 'We do more damage to the rule of law by obstinately refusing to admit errors, thereby perpetuating injustice, than by overturning an erroneous decision.' Johnson Controls, Inc. v. Employers Ins. of Wausau, 264 Wis. 2d 60, 121, 665 N.W.2d 257 (2003). That is why '[i]t is more important that the court should be right upon later and more elaborate consideration of the cases than consistent with previous declarations.' Barden v. Northern Pacific Railroad, 154 U.S. 288, 322, 14 S. Ct. 1030, 38 L. Ed. 992 (1894) ; see also Watts, [376 S.W.3d at 645 ] ('[d]eviations from clear constitutional commands-although longstanding-do not promote respect for the rule of law') (quoting *521 Independence-Nat. v. Independence School, 223 S.W.3d 131, 137 [ (Mo. 2007) ] )." Miller , 295 Kan. at 714, 289 P.3d 1098 (Beier, J., concurring in part and dissenting in part).
Kansas' section 5 right to jury trial is distinct in every conceivable dimension from the section 18 due process-based right to remedy. They share no language; they share no drafting rationale. Indeed, the rights' placement in separate sections of the Bill of Rights makes it obvious that they articulate different concepts aimed to achieve different purposes, and thus merit unique analyses.
Finally, looking beyond our state borders, we note that, at the time Miller was decided, 19 states had addressed whether damages caps violated their state's constitutional jury protections, and not one had employed the quid pro quo test in its analysis. See 295 Kan. at 701-02, 289 P.3d 1098 (Beier, J., concurring in part and dissenting in part) (collecting cases). Since the Miller decision, the Oregon Supreme Court has reversed its position in 1999's Lakin v. Senco Products, Inc. , 329 Or. 62, 987 P.2d 463 (1999), upholding rather than striking down a damages cap under the Oregon Constitution's jury trial provision. See Horton v. Oregon Health and Science Univ. , 359 Or. 168, 376 P.3d 998 (2016). It did not, however, rely on a quid pro quo test to reach the new outcome. On this point of law, Kansas has stood strangely alone.
For all of the reasons outlined above, we abandon the quid pro quo test for analyzing whether the noneconomic damages cap is unconstitutional under section 5 of the Kansas Constitution Bill of Rights.
Fact-Law or Fact-Policy Distinction
Because the Miller majority concluded that K.S.A. 60-19a02 satisfied the quid pro quo test, it did not need to engage in an exhaustive discussion of the more basic question of whether the damages cap infringes on section 5's right to trial by jury. It merely conceded quickly that the cap "encroaches" upon the jury trial right and moved to the quid pro quo analysis to excuse what would otherwise have been a fatal constitutional violation. As discussed in the concurring and dissenting opinion in Miller , the "encroachment" conclusion is logically and legally indistinguishable from a conclusion that the cap impairs the jury trial right of section 5 and is thus unconstitutional, and it should have ended the matter. See 295 Kan. at 698, 289 P.3d 1098 (Beier, J., concurring in part and dissenting in part). It still should and does. We pause, however, to acknowledge and reject one further argument advanced by the Attorney General.
The Attorney General urges us to uphold the damages cap because of what he and other states have characterized as a fact-law or fact-policy distinction. For example, in Virginia, the Supreme Court has said,
"The resolution of disputed facts continues to be a jury's sole function. 'The province of the jury is to settle questions of fact, and when the facts are ascertained the law determines the rights of the parties.' Thus, the Virginia Constitution guarantees only that a jury will resolve disputed facts.
"Without question, the jury's fact-finding function extends to the assessment of damages. Once the jury has ascertained the facts and assessed the damages, however, the constitutional mandate is satisfied. Thereafter, it is the duty of the court to apply the law to the facts.
"The [damages cap] does nothing more than establish the outer limits of a remedy provided by the General Assembly. A remedy is a matter of law, not a matter of fact. A trial court applies the remedy's limitation only after the jury has fulfilled its fact-finding function. Thus, [the damages cap] does not infringe upon the right to a jury trial because the section does not apply until after a jury has completed its assigned function in the judicial process.
"... [A]lthough a party has the right to have a jury assess his damages, he has no right to have a jury dictate through an award the legal consequences of its assessment. [Citations omitted.]" Etheridge v. Medical Center Hospitals , 237 Va. 87, 96, 376 S.E.2d 525 (1989).
The fact-law or fact-policy distinction has been relied on in varying degrees by almost all courts that have upheld damages caps in *522 the face of jury trial-based challenges. See Evans ex rel. Kutch v. State , 56 P.3d 1046, 1050-51 (Alaska 2002) (decision to place cap on damages policy choice, not reexamination of factual question of damages determined by jury); Kirkland v. Blaine County Medical Center , 134 Idaho 464, 469, 4 P.3d 1115 (2000) (jury still allowed to act as fact-finder in personal injury cases; cap statute simply limits legal consequences of jury finding); Johnson v. St. Vincent Hospital, Inc. , 273 Ind. 374, 401, 404 N.E.2d 585 (1980) (to extent of cap, right to have jury assess damages still available), overruled on other grounds by In re Stephens , 867 N.E.2d 148 (Ind. 2007), and abrogated on other grounds by Collins v. Day , 644 N.E.2d 72 (Ind. 1994) ; Peters v. Saft , 597 A.2d 50, 53-54 (Me. 1991) (party does not have right to jury determination of any question desired; right to jury determination only of questions of fact that substantive law makes material); Murphy v. Edmonds , 325 Md. 342, 373, 601 A.2d 102 (1992) (Legislature did not attempt to transfer traditional fact-finding function of jury to judge; instead it abrogated any cause of action for noneconomic damages in excess of damages cap); English v. New England Medical Center , 405 Mass. 423, 426, 541 N.E.2d 329 (1989) (jury trial guarantee does not grant party right to put to jury any question he or she wishes, right "means that, with respect to those questions of fact that the substantive law makes material, the party has the right to have the determination made by a jury"); Gourley v. Nebraska Methodist Health Sys., Inc. , 265 Neb. 918, 953-54, 663 N.W.2d 43 (2003) (jury's primary function of fact-finding includes damages; court's primary function to apply law to facts; damages cap implicates remedy, availability of remedy raises question of law); Tam v. Eighth Jud. Dist. Ct. , 358 P.3d 234, 238 (Nev. 2015) (not role of jury to determine legal consequences of its findings); Arbino v. Johnson & Johnson , 116 Ohio St. 3d 468, 476, 880 N.E.2d 420 (2007) (court simply applies limits as matter of law to facts found by jury); Judd v. Drezga , 103 P.3d 135, 144 (Utah 2004) (jury's duty to determine damages; court's duty to conform jury's finding to applicable law); see also Matter of Certif. of Questions of Law , 544 N.W.2d 183, 203 (S.D. 1996) (jury renders decision on damages, cannot mandate compensation as matter of law; unconstitutional on other ground). Although it did not expressly couch its decision in terms of a fact-law or fact-policy distinction, the Oregon Supreme Court implicitly followed a similar route in 2016's Horton . 359 Or. at 250, 376 P.3d 998. It held that the Oregon Constitution "guarantees litigants a procedural right to have a jury rather than a judge decide those common-law claims and defenses that customarily were tried to a jury" but does not "impose[ ] a substantive limit on the legislature's authority to define the elements of a claim or the extent of damages available for a claim." 359 Or. at 250, 376 P.3d 998.
The lone exceptional rationale among decisions that have upheld a damages cap challenged under a state constitutional jury trial provision challenge appears to be that in Robinson v. Charleston Area Med. Center , 186 W. Va. 720, 731, 414 S.E.2d 877 (1991). In Robinson , the West Virginia Supreme Court of Appeals focused on a "reexamination" clause incorporated in the statement of the constitutional jury trial right. See W. Va. Const. art. 3, § 13 ("No fact tried by a jury shall be otherwise reexamined in any case than according to the rule of court or law."). Because that clause did not mention the Legislature, the legislatively mandated damages cap did not infringe on the jury trial right. 186 W. Va. at 731, 414 S.E.2d 877.
The decisions from 14 of our sister states that have upheld damages caps under attack for violating constitutional jury trial protections do not persuade us.
First, only 8 of the 14 interpreted and applied constitutional provisions including language similar to that of our section 5's "inviolate." See Kirkland , 134 Idaho at 466, 4 P.3d 1115 (Idaho) ; Johnson , 273 Ind. at 383, 404 N.E.2d 585 (Indiana) ; Gourley , 265 Neb. at 953, 663 N.W.2d 43 (Nebraska) ; Murphy , 325 Md. at 351 n.3, 601 A.2d 102 (Maryland; "inviolably preserved"); Tam, 358 P.3d at 238 (Nevada) ; Arbino , 116 Ohio St. 3d at 474, 880 N.E.2d 420 (Ohio) ; Horton , 359 Or. at 226, 376 P.3d 998 (Oregon) ; Matter of Certif. of Questions , 544 N.W.2d at 186 (South Dakota). These eight decisions compose a small majority when compared to those of the *523 highest courts of five states that have struck down damages caps as unconstitutional under constitutional provisions that make the jury trial right "inviolate." See Moore v. Mobile Infirmary Ass'n , 592 So. 2d 156, 159 (Ala. 1991) (Alabama); Smith , 507 So. 2d at 1089-90 (Florida; reading access right in conjunction with jury trial right); Atlanta Oculoplastic Surgery, P.C. , 286 Ga. at 733, 691 S.E.2d 218 (Georgia) ; Watts , 376 S.W.3d at 637 (Missouri) ; Sofie , 112 Wash. 2d at 638, 771 P.2d 711 (Washington).
Second, we simply cannot square a right specially designated by the people as "inviolate" with the practical effect of the damages cap: substituting juries' factual determinations of actual damages with an across-the-board legislative determination of the maximum conceivable amount of actual damages. See Moore , 592 So. 2d at 164 ("Because the statute caps the jury's verdict automatically and absolutely, the jury's function, to the extent the verdict exceeds the damages ceiling, assumes less than an advisory status."). Although, as a purely technical, theoretical matter, we agree that the mere application of an existing damages cap to reduce a jury's award is a matter of law, this statement begs the question at the heart of this case: To whom have the people of Kansas assigned the determination of the amount of the award? Unless an injured party has decided to waive his or her right under section 5, the answer is "the jury."
The Washington Supreme Court has addressed the jury's unique role in determining "ultimate facts," such as damages, and the particular importance of its role in determining noneconomic damages.
" 'To the jury is consigned under the constitution the ultimate power to weigh the evidence and determine the facts-and the amount of damages in a particular case is an ultimate fact.'See also Dacres v. Oregon Ry. & Nav. Co., 1 Wash. 525, 20 P. 601 (1889) (Act of 1883, creating a scheme for determining the value of train-killed animals by appraisers, was unconstitutional because it denied the right to a jury trial); Worthington v. Caldwell, 65 Wash. 2d 269, 273, 396 P.2d 797 (1964) ('Questions of damages should be decided by the jury'). [Citations omitted.]
"The jury's role in determining noneconomic damages is perhaps even more essential. In Bingaman v. Grays Harbor Comm'ty Hosp., 103 Wash. 2d 831, 835, 699 P.2d 1230 (1985), the husband of a woman who died painfully 35 hours after giving birth, the result of medical malpractice, brought a wrongful death and survival action. The only issue before this court was whether the trial judge had properly reduced the jury's damage verdict of $ 412,000 for the woman's pain and suffering. In resolving the issue in the plaintiff's favor, we stated: 'The determination of the amount of damages, particularly in actions of this nature, is primarily and peculiarly within the province of the jury, under proper instructions ...' (Italics ours.) 103 Wash. 2d at 835 [699 P.2d 1230]. See also Lyster v. Metzger, 68 Wash. 2d 216, 224-25, 412 P.2d 340 (1966) (issue of damages, here primarily noneconomic, is within the jury's province); Power v. Union Pac. R.R., 655 F.2d 1380, 1388 (9th Cir. 1981) (under Washington law, damages for loss of companionship determined by trier of fact).
"United States Supreme Court jurisprudence on the Seventh Amendment's scope in civil trials, while not binding on the states, also provides some insight. In Dimick v. Schiedt, 293 U.S. 474, 55 S. Ct. 296, 79 L. Ed. 603 (1935), the Court used historical analysis to determine whether the Seventh Amendment allowed additur. Citing cases and treatises dating from the time of the amendment's adoption, the Court found that determining damages, as an issue of fact, was very much within the jury's province and therefore protected by the Seventh Amendment. The Court also indicated that a judge should give more deference to a jury's verdict when the damages at issue concern a noneconomic loss. The Court quoted the English case of Beardmore v. Carrington, 2 Wils. 244, 248:
" 'There is great difference between cases of damages which [may] be certainly seen, and such as are ideal, as between assumpsit, trespass for goods where the sum and value may be measured, and actions *524 of imprisonment, malicious prosecution, slander and other personal torts, where the damages are matter of opinion, speculation, ideal ...'
293 U.S. at 479, 55 S. Ct. at 298. The Court clarified the implications of the difference between these two classes of actions by quoting from Mayne's Treatise on Damages, at 571: ' "in cases where the amount of damages was uncertain their assessment was a matter so peculiarly within the province of the jury that the Court should not alter it." ' 293 U.S. at 480, 55 S. Ct. at 298." Sofie , 112 Wash. 2d at 646-47, 771 P.2d 711.
Finally, we recognize that the people's assignment of the jury's role in assessing damages furthers the purpose of awards to make the particular injured party whole. See 22 Am. Jur. 2d, Damages § 28 ("The point of an award of damages, whether it is for breach of contract or for a tort, is, so far as possible, to put the victim where he or she would have been had the breach or tort not taken place."). Blackstone recognized this principle in his commentaries. "Now, as all wrongs may be considered as merely a privation of right, the one natural remedy for every species of wrong is the being put in possession of that right whereof the party injured." 3 Blackstone, Commentaries on the Laws of England, at *116 (1765). Ideally, this would be "effected by a specific delivery or restoration of the subject-matter in dispute to the legal owner." 3 Blackstone, at *116. But where this was not a possible or adequate remedy, the injured party should receive "pecuniary satisfaction in damages ... to which damages the party injured has acquired an incomplete or inchoate right, the instant he receives the injury, though such right be not fully ascertained till they are assessed by the intervention of the law." 3 Blackstone, at *116. The jury's traditional role in determining the amount of a pecuniary award necessary to make a party whole includes an assessment of noneconomic damages. See Atlanta Oculoplastic Surgery, P.C. , 286 Ga. at 735, 691 S.E.2d 218 (noneconomic damages long recognized as element of total damages in tort, citing Blackstone).
Regardless of whether an existing damages cap is technically or theoretically applied as a matter of law, the cap's effect is to disturb the jury's finding of fact on the amount of the award. Allowing this substitutes the Legislature's nonspecific judgment for the jury's specific judgment. The people deprived the Legislature of that power when they made the right to trial by jury inviolate. Thus we hold that the cap on damages imposed by K.S.A. 60-19a02 is facially unconstitutional because it violates section 5 of the Kansas Constitution Bill of Rights.
CONCLUSION
For the reasons outlined above, we reverse the decision of the Court of Appeals affirming the district court and reverse the district court's judgment. We remand this case to the district court for further proceedings in keeping with this decision.
Nuss, C.J., not participating.
Stegall, J., concurring in part and concurring in judgment:
I agree with and join the majority of the court that today reverses the so-called "quid pro quo" test as applied in the context of a section 5 challenge under the Kansas Constitution Bill of Rights. I agree that if an act of the Legislature invades the historic province of the jury to decide a contested matter then the plain, original public meaning of section 5 is violated. I join the portion of the majority opinion describing and applying the plain and original public meaning of section 5.
I disagree, however, with the way a plurality of the court appears to assume that K.S.A. 60-19a02 must implicate section 5 in the first place. To me, this is far from clear. Whether the statute implicates section 5 is a threshold question and the answer may depend on the standard of review we apply. For this reason, I first consider and discuss the history of our "clear error" standard of review and our recent partial departure from that rule. Finally, I conclude that though it is a close call, K.S.A. 60-19a02 does in fact invade the historic province of the jury to decide a contested matter. As such, I concur *525 in the judgment we reach that K.S.A. 60-19a02 violates section 5.
Background
To clarify how I differ from the three-justice lead opinion in today's decision, some background explanation will be helpful. For ease of reference, I will refer to the lead opinion as simply the "majority," although it is a true majority only for those portions I have joined, and otherwise represents only a plurality of justices on this court. The importance of this distinction will become apparent.
As the majority explains, there is a clear difference between section 5 and section 18 in the Kansas Constitution Bill of Rights. Op. at 513. The section 5"right of trial by jury" that "shall be inviolate" is a procedural right to who decides contested questions in Kansas courts. It does not guarantee or prescribe the substantive matter of which questions Kansas courts can decide. A different provision of the Kansas Constitution-section 18-governs the latter. So the procedural right to have a jury (rather than, say, the Legislature) decide the kinds of contested questions juries historically decided is sacrosanct under the Kansas Constitution. But the substantive decision about what kinds of questions-in legalese, what causes of action-Kansas courts have the power to resolve is untouched by the section 5 guarantee. Put another way, just because a jury would have resolved a particular substantive question under Kansas common law in 1859 does not mean that a party has a constitutional right to a jury resolution of that question today. This is because the scope of contested questions that Kansas courts may answer can and does change-and this does not violate section 5.
Historically, which questions-which causes of action-Kansas courts have the power to resolve has been a matter of common law decision-making by Kansas courts. But it is a universally accepted principle that the Legislature has the power to abrogate or modify the common law. See, e.g., Manzanares v. Bell , 214 Kan. 589, 616, 522 P.2d 1291 (1974) ("[T]he Legislature has the power to modify the common law."). That is, the Legislature has the power to substantively change or even eliminate common law causes of action; or to create new statutory causes of action. See Shirley v. Glass , 297 Kan. 888, 893, 308 P.3d 1 (2013) ("Legislatures may create private causes of action that the common law did not recognize."); see also Stanley v. Sullivan , 300 Kan. 1015, 1018, 336 P.3d 870 (2014) ("As a general rule, statutory law supersedes common law."). With respect to civil remedies, the constitutional restraint on this legislative discretion is found in section 18 of the Kansas Constitution Bill of Rights. Put simply, so long as it does not run afoul of the Constitution, the Legislature has the power to describe and define which questions Kansas courts can resolve. And when those questions are of the kind historically given to juries to decide, section 5 only requires that those questions remain with Kansas juries.
Given this, the threshold question we should ask of K.S.A. 60-19a02 or any statute challenged under sections 5 and 18 is whether it is a procedural measure affecting who decides or a substantive measure affecting what is being decided . If it is the former, section 5 and its inviolate guarantee applies. If it is the latter, section 18-with its wider guard rails-applies.
Is K.S.A. 60-19a02 procedural or substantive?
The Attorney General gets at this key threshold determination-albeit obliquely-when he argues the so-called "fact-law" distinction. He urges us to adopt the rationale of the Virginia Supreme Court, which the majority also quotes:
"The [damages cap] does nothing more than establish the outer limits of a remedy provided by the General Assembly. A remedy is a matter of law, not a matter of fact. A trial court applies the remedy's limitation only after the jury has fulfilled its fact-finding function. Thus, [the damages cap] does not infringe upon the right to a jury trial because the section does not apply until after a jury has completed its assigned function in the judicial process." Etheridge v. Medical Center Hospitals , 237 Va. 87, 96, 376 S.E.2d 525 (1989) ; Op. at 521.
*526 And indeed, some of our predecessors on this court have followed a similar analytical path. See Samsel v. Wheeler Transport Services, Inc., 246 Kan. 336, 363, 789 P.2d 541 (1990) (McFarland, J., concurring).
In my view, the majority does not give enough careful attention to the argument that K.S.A. 60-19a02 does not implicate section 5 at all because it is a remedy provision that simply modifies an available cause of action-and should therefore be analyzed under section 18 instead of section 5. I am concerned the majority repeats the error (identified by then Justice McFarland in Samsel ) of "lumping together the right to trial by jury on the question of liability and the remedy to be afforded if liability is established, and then freezing the lump in a common-law time warp." 246 Kan. at 363, 789 P.2d 541 (McFarland, J., concurring). I agree with Justice McFarland that there is "no legal basis for including the scope of the remedy in the right to a jury trial. ... [T]he scope of the remedy to be afforded is a matter of legislative determination ...." 246 Kan. at 363, 789 P.2d 541 (McFarland, J., concurring).
In fact, the damage cap has some markings of both a procedural (who decides) and a substantive (what gets decided) measure. It cannot be both, and the constitutionality of the cap will likely turn on which category we assign it to. On the one hand, the effect of the cap is to substantively limit all causes of action for noneconomic damages. On the other hand, the cap is not written in the language of a modification of a personal injury cause of action. In fact, the cap does not take any question away from the jury or substantively alter its role at all. The very fact that the jury is permitted to "find" a phantom damage amount beyond the cap which is then "replaced" by the legislative judgment suggests the Legislature is actually substituting its decision for that of the jury.
Finally, K.S.A. 60-19a02(d)'s requirement that "the court shall not instruct the jury on the limitations of this section" is a clear indication to me that the Legislature sought to substitute its judgment for the judgment of the jury. Why else would the Legislature play hide-the-ball with something so consequential? Juries are told the substantive elements of the causes of action being tried in front of them. The legislative refusal to let the jury know about the damage cap tips the balance of consideration in my mind from a substantive modification of the cause of action to a procedural interference with the inviolate right to a jury protected by section 5. The Legislature that passed K.S.A. 60-19a02 wanted to achieve a substantive outcome without modifying the substantive cause of action. So, it decided to substitute its decision for that of the jury's. It changed who decides, not what is being decided.
There may be many reasons the Legislature took the procedural rather than the substantive route to achieve its policy goals. Perhaps the Legislature worried that straightforwardly modifying the substantive cause of action would incentivize juries to shift damage awards to other causes of action or categories of damages. Perhaps the political will did not exist to do directly what some believed could be accomplished procedurally.
So which category does K.S.A. 60-19a02 belong to? Answering this question, in turn, leads me to first consider our standard of judicial review.
De Novo or Clear Error Review?
The majority acknowledges the boilerplate standard of review we use to consider the constitutionality of a statute: "[B]efore a statute may be struck down, the constitutional violation must be clear. The statute is presumed to be constitutional, and all doubts are resolved in favor of upholding it. If a court can find any reasonable way to construe the statute as valid, it must." Board of Johnson County Comm'rs v. Jordan , 303 Kan. 844, 858, 370 P.3d 1170 (2016).
But, citing our recent decision in Hodes & Nauser, MDs v. Schmidt , 309 Kan. 610, 680, 440 P.3d 461 (2019), the majority declines to apply this "clear error" rule of judicial review in today's case. Op. at 513. In Hodes , a majority of this court rolled back the presumption of constitutionality in cases involving "fundamental interests" under the Kansas Constitution. 309 Kan. at 673, 440 P.3d 461.
*527 In this case, whether we review the constitutionality of K.S.A. 60-19a02 de novo, or with a presumption of constitutionality that can only be overcome if we have no reasonable doubt about the alleged constitutional violation, matters to the outcome. If I were to apply the presumption and its highly deferential standard of review, I would be forced to conclude that K.S.A. 60-19a02 is a substantive measure modifying an available cause of action in Kansas. Then I would consider whether this substantive modification of an available cause of action violated section 18. This outcome is mandated under our "clear error" standard of review because when "all doubts are resolved in favor of upholding" the statute the "constitutional violation" is not "clear." Board of Johnson County Comm'rs , 303 Kan. at 858, 370 P.3d 1170.
I have been-and remain-critical of judicial exercises in dividing up constitutional rights and provisions into preferred (fundamental) and less preferred (or even ignored) categories. See Hodes , 309 Kan. at 774, 440 P.3d 461 (Stegall, J., dissenting) ("[I]t is the courts' job to patrol boundaries, not to decide ... 'fundamental' or 'substantive' values."). I am even less enamored with the judicial practice of treating these categories differently as a matter of judicial review. See 309 Kan. at 720, 440 P.3d 461 (Stegall, J., dissenting) (critiquing the adoption of "judicially favored rights and a byzantine system of tiered scrutiny"). So I cannot agree with the proposition that we ought to exercise different standards of review depending on which part of the Constitution we are interpreting or enforcing. Even so, I am content, at present, to abandon our clear error standard of review in favor of de novo review in this case, as set forth by the majority. See op. at 513. The reason is two-fold. First, over my dissent in Hodes , de novo review in a case involving so-called "fundamental" rights is now controlling precedent in Kansas. Second, and more importantly, as discussed below, I suspect the infirmity in the precedent does not lie in going too far, but in not going far enough. Perhaps courts should exercise de novo review over Kansas statutes when any portion of our Constitution is implicated, not only when judicially favored rights are involved.
Thus, applying a de novo standard of review, I conclude the Legislature that passed K.S.A. 60-19a02 did not alter the cause of action for noneconomic damages but instead substituted its judgment for the jury's. As set forth in the majority opinion, this violates section 5 of the Kansas Constitution Bill of Rights.
Reconsidering the Clear Error Rule
I take this opportunity to question whether the clear error rule should be retained for any species of constitutional review in Kansas. Is it proper for this court to let statutes stand that probably-or even almost certainly-violate any part of the Kansas Constitution just because the violation is not clear or without any doubt? It is an important question that cuts to the heart of the judicial power itself. The parties, however, have not raised or argued the issue. Because resolving it in this case is unnecessary under the current precedent of this court, I will only embark on a skeletal discussion of the question which, by necessity, must arise in earnest sometime soon.
What I have been calling our "clear error" standard of review is often referred to as Thayerism in academic literature-named for Professor James B. Thayer after his 1893 article "The Origin and Scope of the American Doctrine of Constitutional Law " appeared in the Harvard Law Review. 7 Harv. L. Rev. 129 (1893) ; see Grey, Thayer's Doctrine: Notes on Its Origin, Scope, and Present Implications , 88 Nw. U. L. Rev. 28 (1993). After surveying the law of judicial review, Thayer concluded that courts "can only disregard the [statute] when those who have the right to make laws have not merely made a mistake, but have made a very clear one,-so clear that it is not open to rational question." 7 Harv. L. Rev. at 144.
Thayer's doctrinal formulation of what was otherwise an inchoate body of law received an early endorsement from the influential Supreme Court Justice Oliver Wendell Holmes. See Mendelson, *528 The Influence of James B. Thayer upon the Work of Holmes, Brandeis, and Frankfurter , 31 Vand. L. Rev. 71, 73 (1978). Justice Holmes-often described as the father of modern era judicial restraint-once remarked that a judgment concerning constitutionality often "turns on the feeling of the community" and "we accept the judgment unless it makes us puke." Letter from Justice Holmes to Harold Laski (October 23, 1926), in Holmes-Laski Letters: The Correspondence of Mr. Justice Holmes and Harold J. Laski 1916-1935, pp. 887, 888 (Howe ed., 1953). Thus, Thayerism can be described as a kind of judicial puke test-is the law in question so unconstitutional that judges simply can't stomach it?
In Kansas, there is evidence that we at least acknowledged some form of Thayerism from our earliest days as a state. See State ex rel. Crawford v. Robinson and others , 1 Kan. 17, 27, 1862 WL 397 (1862) ("It has been repeatedly held, by the Supreme Court of nearly all the States of the Union, that no statute should be declared unconstitutional, unless its infringement of the superior law is clear, beyond substantial doubt."). There were also times we questioned the doctrine's relevance to our decision making. For example, in Comm'rs of Wyandotte Co. v. Abbott , 52 Kan. 148, 157, 34 P. 416 (1893), we noted that "[w]e appreciate the well-settled doctrine of this court, as, also, of the supreme courts of nearly all the states, that no statute should be declared unconstitutional unless the infringement of the superior law is clear, beyond substantial doubt." But even so, we declared that it would be " 'dangerous ... to announce, that any of the provisions of the constitution may be obeyed or disregarded at the mere will or pleasure of the legislature, unless it is clear beyond all question that such was the intention of the framers of the instrument.' " 52 Kan. at 157-58, 34 P. 416.
For most of our history, however, we have routinely recited some version of Thayerism as a constraining principle when reviewing the constitutionality of statutes. See Board of Johnson County Comm'rs , 303 Kan. at 858, 370 P.3d 1170 ("[B]efore a statute may be struck down, the constitutional violation must be clear. The statute is presumed to be constitutional, and all doubts are resolved in favor of upholding it."); State v. Cook , 286 Kan. 766, 768, 187 P.3d 1283 (2008) ("We will not declare a statute unconstitutional as applied unless it is clear beyond a reasonable doubt that the statute infringes on constitutionally protected rights."); Moody v. Board of Shawnee County Comm'rs , 237 Kan. 67, 74, 697 P.2d 1310 (1985) ("A statute should not be stricken down unless the infringement of the superior law is clear beyond substantial doubt."); Hunt v. Eddy , 150 Kan. 1, 10, 90 P.2d 747 (1939) ("Statutes should not be declared unconstitutional unless the infringement of the superior law is clear beyond substantial doubt."); State v. Sherow , 87 Kan. 235, 239, 123 P. 866 (1912) ("This court has always endeavored to interpret acts of the legislature with the utmost liberality and to uphold them, unless beyond reasonable doubt they are found to conflict with some provision of the higher law. Doubts have always been resolved in favor of the statute.").
But we have never engaged in any sustained analysis of the constitutional roots of the rule or inquired whether Thayerism is proper under our government's constitutional structure. Simply put, the question is whether the "judicial power" vested by article 3, section 1 of the Kansas Constitution"exclusively in one court of justice" is limited by Thayerism. Do Kansas courts have the power to overturn statutes as unconstitutional even when the unconstitutionality is not clear beyond a reasonable doubt? As mentioned, answering this question is beyond the scope of today's opinion. But it is ripe for future litigation and review by this court. For now, four short thoughts will suffice.
First, deciding the proper measure of deference courts must show to the other branches of government implicates the separation of powers and thus our government's constitutional structure. I have noted before that the decline of "this court's separation of powers jurisprudence ... was aided in no small part by our application of judicial deference." Solomon v. State , 303 Kan. 512, 541, 364 P.3d 536 (2015) (Stegall, J., concurring). I criticized our court for invoking the presumption of constitutionality to uphold statutes we believed were unconstitutional, concluding that
"while judicial deference to the exercise of legislative or executive powers is entirely meet and proper, the same deference *529 shown to the legislative or executive departments when they act outside of their respective vested powers is, in actual fact, an abdication of the vested judicial power to say what the law is.
....
"... I would return this court to the active judicial role and obligation to guard and protect a clear and strong wall of separation between each of the three great departments of government-keeping each within its proper province and protecting those provinces from colonization by the other two departments. It is within the judicial province to carefully exercise this power without deference to the other branches ...." 303 Kan. at 543, 545, 364 P.3d 536 (Stegall, J., concurring).
While not a direct assault on Thayerism, at a minimum this suggests the strong presumption of constitutionality undermines the bedrock constitutional principle of separation of powers. Here it must be noted that Thayer's presumption is distinct from the doctrine of constitutional avoidance, which is a rule of statutory construction that applies when a statute is ambiguous. See State v. Ryce , 303 Kan. 899, 966, 368 P.3d 342 (2016) (Stegall, J., dissenting) (distinguishing the constitutional avoidance doctrine, which preserves the Legislature's policy choices, from deference, which abdicates the judicial role), adhered to on reh'g 306 Kan. 682, 396 P.3d 711 (2017).
Second, to fully flesh out these arguments, it would be necessary to investigate the original public meaning of "the judicial power" at the time the Kansas Constitution was written and ratified. See State v. Riffe , 308 Kan. 103, 113-14, 418 P.3d 1278 (2018) (Stegall, J., concurring) (explaining the two basic tenets of original public meaning jurisprudence: that the Constitution's meaning is fixed at the time of its adoption and its meaning is based on the common understanding of the people adopting it). To date, the most thorough, though indirect, consideration of that question is found in my recent dissenting opinion in Hodes . Hodes , 309 Kan. at 707, 440 P.3d 461 (Stegall, J., dissenting).
In Hodes , I analyzed section 1 of the Kansas Constitution Bill of Rights at length, concluding that it was originally understood as a provision limiting the police power of the Legislature. 309 Kan. at 768, 440 P.3d 461 (Stegall, J., dissenting). I detailed how section 1 mandated judicial review of all legislative acts under a standard I colloquially called "rational basis with bite." 309 Kan. at 768, 440 P.3d 461 (Stegall, J., dissenting). Under this standard, "[a]pplying the necessary deference, a court must examine the actual legislative record to determine the real purpose behind any law in question before it can conclude the law is within the limited constitutional grant of power possessed by the State." 309 Kan. at 767, 440 P.3d 461 (Stegall, J., dissenting). Again, at least on the surface, it is difficult to square Thayerism with such review.
Third, justices on other state supreme courts have compellingly argued against the application of Thayerism in their jurisdictions. For example, in one notable concurrence, Justice Richard B. Sanders of the Washington Supreme Court rejected Thayerism because it lacked textual support in the constitution and denied citizens the protection of an independent and impartial judiciary. Island County v. State , 135 Wash. 2d 141, 955 P.2d 377 (1998) (Sanders, J., concurring). As Justice Sanders explained, " 'where the will of the legislature declared in its statute, stands in opposition to that of the people declared in the constitution, the judges ought to be governed by the latter, rather than the former.' " 135 Wash. 2d at 157, 955 P.2d 377 (quoting The Federalist No. 78 [Alexander Hamilton] [May 28, 1788], reprinted in The Federalist Papers by Alexander Hamilton, James Madison and John Jay, pp. 395-96 [Garry Wills ed., 1982] ). For "it is the constitution, and only the constitution, through which the people speak for themselves. Their voice is fundamental, and it is only by their consent that we are governed." 135 Wash. 2d at 158, 955 P.2d 377. Similarly, Justice Rebecca Grassl Bradley of the Wisconsin Supreme Court warned, "[I]n contrast to the structural separation of powers our framers envisioned, judicial deference gives the legislature both the pen and the gavel over their own laws, and imposes a 'tremendous burden' on individuals attempting to limit the constitutional *530 overreach of legislative power." Mayo v. Wisconsin Injured Patients and Families Compen. Fund , 383 Wis. 2d 1, 53, 914 N.W.2d 678 (2018) (Grassl Bradley, J., concurring) (quoting Burke, The "Presumption of Constitutionality" Doctrine and the Rehnquist Court: A Lethal Combination for Individual Liberty , 18 Harv. J.L. & Pub. Pol'y 73, 90 [1994] ).
Fourth and finally, it is important to concede that despite its weaknesses, Thayerism is not without its virtues. Chief among them is the pragmatic virtue of encouraging judges to resist an excess of judicial formalism. Judge Richard Posner has, perhaps, done the most convincing work on this point. Judge Posner helpfully contrasts Thayerism with the rise of constitutional "theory." The promise of constitutional theory has always been that theoretical principles, properly applied, will produce "correct" constitutional outcomes. Thayerism, however, is not designed to produce a single "right" answer, but is instead designed to aid judges who want to decide cases "sensibly or prudently." Posner, The Rise and Fall of Judicial Self-Restraint , 100 Cal. L. Rev. 519, 535 (2012).
Judge Posner attributes-rightly so in my view-the decline in Thayeristic judging (if not the decline of its rhetoric) to the rise of constitutional theory purporting to deliver correct outcomes. "The precondition to a judge's embrace of Thayer's standard ... is to have no theory of how to decide whether a statute or an executive action violates the Constitution. ... Today, with constitutional debate awash with theory, judges may feel a certain nakedness in having none." 100 Cal. L. Rev. at 538. So, if there is one, knowable, and correct answer to every constitutional question, the idea (implicit in Thayer's formulation) that a statute might or might not be constitutional loses most of its rhetorical heft and all of its analytical oomph.
Thus, on the one hand, Thayerism has declined in an atmosphere of increasing confidence that constitutional theory can give judges and scholars "the keys to unlocking the Constitution's secrets." 100 Cal. L. Rev. at 546. On the other hand, Thayerism suffers from what Posner calls the "ratchet theory of judicial restraint," which occurs when "unrestrained liberals expand constitutional rights" and "restrained conservatives preserve those rights by complying scrupulously with precedent in order to limit their own discretion." 100 Cal. L. Rev. at 547. In this environment, "[j]udicial self-restraint has ceased to be a contender." 100 Cal. L. Rev. at 548.
Of course, Thayerism is not the only nontheoretical principle that can restrain judges. And Judge Posner's definition of judicial pragmatism-a rejection of the formalist notion that "a legalistic algorithm" will produce a correct decision in "every case"-suggests other paths of self-restraint are available to adherents of constitutional theory. 100 Cal. L. Rev. at 539-40. Even originalist judges must exercise judgment . See Issacharoff, Pragmatic Originalism? , 4 NYU J.L. & Liberty 517, 531 (2009) ; but see Kramer, Two (More) Problems with Originalism , 31 Harv. J.L. & Pub. Pol'y 907, 907 (2008) ("there is no such thing as pragmatic originalism").
The warning to judicial theorists that we abandon prudent, sensible, and self-restrained judging at our and the Republic's peril should not fall on theoretically deafened ears. Yes, even a committed originalist ought to be "a jurist aware of his own humanity, attuned to the humanity of those before him, and willing to allow both to shape his judgment." Judge, Judges and Judgment: In Praise of Instigators , 86 U. Chi. L. R. (forthcoming Feb. 2019); see Riffe , 308 Kan. at 117, 418 P.3d 1278 (Stegall, J., concurring) ("[H]umility-attendant as it is to the indeterminacy of language and the difficulties of the interpretive process-must be considered a third, equally important leg of the originalist stool."). Prudential principals such as justiciability, judicial humility, a recognition of the limits of judicial competency, constitutional avoidance, respect for precedent, and the duty of candor when explaining our decisions all should play a role.
Conclusion
In short, applying de novo review to what I consider a difficult constitutional call, I am compelled by the unique characteristics of the damage cap, as I describe them above, to conclude that the Legislature has substituted *531 its judgment for the judgment of the jury. While the policy ends sought by the Legislature may be acceptable, here, the Legislature has chosen means that section 5 forecloses. The Legislature remains free-within the bounds of section 18 -to limit or otherwise modify the common law cause of action for damages. But it must do so clearly and straightforwardly. Otherwise, the section 5 right is illusory, and the judgments of Kansas juries are no better than a mirage.
Therefore, I concur in the judgment.